413 A.2d 1037

**NORFOLK AND WESTERN RAILWAY COMPANY,**
**Appellee at Nos. 110 and 111**

**v.**

**PENNSYLVANIA PUBLIC UTILITY COMMISSION,**
**Appellant at No. 111**

**and**

**Pennsylvania State Legislative Board, United Transportation Union, Appellant at No. 110.**

Supreme Court of Pennsylvania.

Argued March 6, 1980.

Decided April 25, 1980.

H. Woodruff Turner, Dennis M. Sheedy, Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, for Norfolk and Western Railway Co.

James Kutz, Asst. Counsel, John B. Wilson, Deputy Chief Counsel, George M. Kashi, Chief Counsel, Harrisburg, for PUC.

T. P. Shearer, Pittsburgh, for Pa. State Legislative Board, United Transportation Union.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

This case involves a challenge to the validity of the Pennsylvania Public Utility Commission (PUC) regulation which requires that locomotives operating in the Commonwealth be equipped with devices which sanitarily dispose of human waste material.[1] The PUC, after a hearing, found that appellee Norfolk and Western Railway Company (N&W) was in violation of this requirement, and ordered appellee to cease operation of its locomotives until compliance is achieved. On appeal a three-judge panel of the Commonwealth Court reversed the PUC order, holding that the federal Boiler Inspection Act[2] preempts all state regulation of locomotives used in interstate commerce.

We disagree with the Commonwealth Court's interpretation of federal law and hold that: (1) state regulation of sanitary devices on locomotives is not preempted by the Boiler Inspection Act or the Federal Railroad Safety Act of 1970;[3] (2) state regulation is not preempted by the regulations of the Food and Drug Administration (FDA); (3) enforcement of the PUC regulation does not unduly burden interstate commerce; and (4) the findings of the PUC that the N&W system does not sanitarily dispose of human waste material is supported by substantial evidence.[4] Accordingly, the order of the Commonwealth Court is reversed, and the order of the PUC is reinstated.

1. 52 Pa.Code § 3362 provides:
   "(a) All locomotives operated by or on each of the railroads in this Commonwealth, except those specifically exempted, shall be equipped with flush toilets or similar devices which sanitarily dispose of human waste matter, together with toilet paper properly protected from soil prior to use."

2. 45 U.S.C. §§ 22–34.

3. Federal Railroad Safety Act of 1970, 45 U.S.C. § 421 et seq.

4. Questions other than the scope of the Boiler Inspection Act were not reached by the Commonwealth Court, as it held that issue to be dispositive. The remaining three issues were adequately raised and briefed and are properly before this Court.

I

Norfolk and Western Railway (N&W) is an interstate freight carrier which operates in twelve states, including Pennsylvania. Prior to 1971, N&W's engines were equipped with flush toilets which discharged untreated human waste material onto the right-of-way. In 1971 the FDA, pursuant to the Communicable Disease Act,[5] enacted regulations which prohibited the discharge of untreated waste in this manner.[6] In response to these regulations, N&W designed its "NW Sanitary Toilet System:"

> "The N&W sanitary toilet system is composed of a combination wash basin/urinal, and a toilet. The toilet consists of a hollow seat fastened to the floor of the locomotive. The user inserts a polyethylene bag through the hole in the seat and drapes the top of the bag over the seat. After use, the bag is supposed to be sealed with a non-slip tie and placed in a plastic holding container. The container must be carried in the hood of the locomotive until disposed of in an off-site pathological incinerator."

(PUC Findings Nos. 15 & 16).

Before installation of the new system, N&W sought FDA approval that the system would comply with the FDA regulations on communicable disease. The FDA approved the system on the ground that the system as designed would not discharge waste material onto the right-of-way. Furthermore, the FDA's approval was conditional:

5. 42 U.S.C. § 264.

6. 21 C.F.R. § 1250.51(a) provides that "new railroad conveyances" placed into service after July 1, 1972 are not to discharge untreated waste "except at servicing areas approved by the Commissioner of Food and Drugs. In lieu of retention pending discharge at approved servicing areas, human wastes, garbage, waste water or other polluting materials that have been suitably treated to prevent the spread of communicable disease may be discharged from such conveyances . . . ."

The FDA imposed the same requirements on "nonnew railroad conveyances." 21 C.F.R. § 1250.51(b). The final compliance deadline of December 31, 1977 for nonnew conveyances was stayed temporarily as of November 1, 1977, 42 Fed.Reg. 57122, and the stay has not yet been lifted.

"Since the disposal system meets the major intent of the federal regulation (42 CFR 72.154) in prohibiting the discharge of raw human waste upon railroad tracks, there is no objection to the system being used on locomotives and cabooses. *The clearance for this type of disposal equipment is given on the basis that the entire disposal system, including the bag receptable [sic] containers, urinal chlorination fixtures, and incinerators, be installed, and operated, and maintained in an acceptable sanitary manner.*" [7]

(Emphasis added). By July of 1976, the system was installed on 1,160 locomotives.

Long prior to 1971, the PUC, in the regulation challenged here, required that "all locomotives operated by or on each of the railroads in this Commonwealth, except those specifically exempted, shall be equipped with flush toilets or similar devices which sanitarily dispose of human waste matter, together with toilet paper properly protected from soil prior to use." 52 Pa.Code § 33.62. On January 5, 1976 appellant Pennsylvania State Legislative Board, United Transportation Union (UTU) filed a petition with the PUC alleging that N&W's locomotives violate § 33.62. On July 15, 1976 the PUC held a hearing on the UTU's petition. The PUC found, inter alia, that:

"Many problems have arisen in connection with the N&W sanitary toilet system: plastic bags have been thrown from the engines; at times there are no bags or ties on the locomotive; plastic receptacles are sometimes cracked; bags have ripped; N&W has never actually tested its sanitary toilet system in day to day use; and connecting carriers over which N&W engines move are not equipped to service the N&W Sanitary Toilet System. (Finding No. 19)

Complaints have been made to N&W regarding odor emanating from both plastic bags and urinals. (No. 20)

The only pathological incinerator in Pennsylvania, on the N&W line, is at Rook, Pennsylvania. (No. 17)

7. Letter from Fred O. Bridges, Equipment Review Officer, Interstate Travel Sanitation Branch, dated March 20, 1973. (Record at 199a).

Only about 50 per cent of N&W's through locomotives are dispatched at Rook, and the others move through the yard without being dispatched. (No. 8)

The N&W sanitary toilet system does not sanitarily dispose of human waste matter. (No. 21)

The N&W system is unique since no other railroad in the United States has a similar system. (No. 22)

No other state has regulations covering the same subject matter as 52 Pa.Code § 33.62. (No. 23)"

In light of these findings, the PUC ordered N&W to discontinue within 120 days operation of all locomotives which did not comply with § 33.62. As already indicated, N&W appealed to the Commonwealth Court which reversed the PUC order and dismissed the complaint on the ground that Pennsylvania was precluded from regulating any parts of locomotives used in interstate commerce.

## II

### A.

■ The power to regulate local matters relating to health and safety, known as the police power, is traditionally reserved to the states. *Commonwealth v. Barnes & Tucker Co.*, 472 Pa. 115, 371 A.2d 461 (1977); *Allen-Bradley Local No. 1111 v. Wisconsin E. R. Board*, 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154 (1942); *Lawton v. Steele*, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385 (1894). The state's power to regulate in an area, however, is subject to limitation by Congress. As articulated by the United States Supreme Court in *Rice v. Santa Fe Elevator Corporation*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1946), "[w]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purposes of Congress" (citing cases).

■ In matters involving interstate commerce, states may act provided that the federal government has not preempted the field, *Pennsylvania R. Co. v. PUC of Pa.*, 250 U.S. 566, 40 S.Ct. 36, 64 L.Ed. 1142 (1919), and so long as the

state regulation does not impose an undue burden on interstate commerce. (See Part IV, infra). Federal preemption of an area within interstate commerce is sometimes expressly articulated by Congress. See, e. g., *Allegheny Airlines, Inc. v. Philadelphia*, 453 Pa. 181, 309 A.2d 157 (1973) (Federal Aviation Act expressly preempts state taxation of air commerce). In the absence of express preemption, however, the manifestation of Congressional intention to occupy a field must be unmistakable. In *Maurer v. Hamilton*, Justice Stone, speaking for a unanimous Court, stated:

> "Congressional intention to displace local laws in the exercise of its commerce power is not, in general, to be inferred unless clearly indicated by those considerations which are persuasive of the statutory purpose. This is especially the case when public safety and health are concerned."

309 U.S. 598, 614, 60 S.Ct. 726, 734, 84 L.Ed. 969 (1940).

In matters involving interstate commerce, the requirement that Congressional intent to preempt be clear and unambiguous stems from the inherent tension between the federal commerce power and the state police power.

> "[T]he Constitution when 'conferring upon Congress the regulation of commerce, . . . never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country."

*Huron Portland Cement Company v. City of Detroit*, 362 U.S. 440, 443–44, 80 S.Ct. 813, 816, 4 L.Ed.2d 852 (1960) (citing cases). Hence, the admonition of the United States Supreme Court in *Florida Lime and Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963):

> "[F]ederal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that Congress has unmistakably so ordained."

■ With respect to the field of railroad safety, review of the relevant statutes, legislative history, and case law construing the legislation, mandates the conclusion that the federal government has not preempted the entire field.[8] We reach this conclusion based on the clear intent of Congress, articulated in the Federal Railway Safety Act of 1970, to permit state regulation of railroad safety until preempted by the Secretary of Transportation.[9]

## B.

Appellee N&W contends that the Commonwealth Court correctly found that the Boiler Inspection Act preempts the entire field of railroad safety. The Act provides that:

"It shall be unlawful for any carrier to use or permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same be employed in the active service of such carrier without unnecessary peril to life or limb, and unless said locomotive, its boiler, tender, and all parts and appurtenances thereof have been inspected from time to time in accordance with the provisions of sections 28 to 30 and 32 of this title and are able

---

**8.** The parties do not question that sanitary devices are within the scope of "railroad safety," nor do we. The Commonwealth Court erroneously distinguished sanitary devices ("locomotive equipment"), from "railroad safety," in order to explain its departure from *Bessemer & Lake Erie RR Co. v. Pa. PUC*, 28 Pa.Cmwlth. 461, 368 A.2d 1305 (1977). There the Commonwealth Court held that § 205 of the FRSA redefined the extent of federal preemption of railroad safety earlier delineated in *Napier* and *Bessemer I*, infra.

We find the distinction between sanitation "locomotive equipment" and "railroad safety" to be without merit. See *Napier*, infra, 272 U.S. 605, 47 S.Ct. 207 at 209–10 (Court rejected distinction between regulations directed toward "promotion of health and comfort," and regulations aimed at "prevent[ion of] accidental injury in the operation of trains); *Urie v. Thompson*, 337 U.S. 163, 193–94, 69 S.Ct. 1018, 1036, 93 L.Ed. 1282 (1949) (Boiler Inspection Act vests in ICC power to protect employee health as well as safeguarding against accidental injury).

**9.** 45 U.S.C. § 434, text infra at note 10.

to withstand such test or tests as may be prescribed in the rules and regulations hereinafter provided for." [10]

In *Napier v. Atlantic Coastline R. R. Co.*, 272 U.S. 605, 47 S.Ct. 207, 71 L.Ed. 432 (1926), the United States Supreme Court held that this statute evidenced Congressional intent to preempt the field of railroad safety. *Napier* involved a challenge to two state safety equipment requirements: a Georgia statute requiring automatic firebox doors and a Wisconsin regulation requiring cab curtains. The states claimed that their requirements were not precluded because their purpose, the promotion of the health and comfort of railroad employees, differed from the purpose of the Boiler Inspection Act, the prevention of accidental injury. The Court rejected this argument on the ground that "[t]he federal and state statutes are directed to the same subject—the equipment of locomotives." 272 U.S. at 612, 47 S.Ct. at 210.

*Napier* was followed by this Court when faced with the question of the preemptive effect of section 25 of the Interstate Commerce Act in *Bessemer & Lake Erie Railroad Company v. Pa. Public Utility Commission*, 430 Pa. 339, 243 A.2d 358 (1968), cert. den., 393 U.S. 959, 89 S.Ct. 395, 21 L.Ed.2d 373 (1969). [11] There we struck down a state manual

---

**10.** The Boiler Inspection Act of 1911 applied only to the boiler of the locomotive. In 1915 the Act was amended to cover the locomotive, "its boiler, tender, and all parts and appurtenances."

**11.** Section 25 of the Interstate Commerce Act provides in pertinent part as follows:

> "*Order to install systems, etc.; modification; negligence of carrier*
> (b) The Commission may, after investigation, if found necessary in the public interest, order any carrier within a time specified in the order, to install the block signal system, interlocking, automatic train stop, train control, and/or cab-signal devices, *and/or other similar appliances, methods, and systems intended to promote the safety of railroad operation,* which comply with specifications and requirements prescribed by the Commission, upon the whole or any part of its railroad such order to be issued and published a reasonable time (as determined by the Commission) in advance of the date for its fulfillment: *Provided,* That block signal systems, interlocking, automatic train stop, train control, and cab-signal devices in use on August 26, 1937, or such systems or devices

flagging regulation on the ground that the federal statute preempted state regulation of flagging protection. This conclusion was based on our findings that the safety devices required by § 25 performed the "exact same function" as the state-required manual flagging, and that the language of § 25 was sufficiently broad to evidence Congressional intent to regulate the entire field of rear end collision prevention. Compare *Terminal R. Ass'n v. Brotherhood of RR Trainmen*, 318 U.S. 1, 63 S.Ct. 420, 87 L.Ed. 571 (1943).[12]

■ Appellees urge that *Napier* and *Bessemer* are controlling on the issue of preemption by the Boiler Inspection Act.

hereinafter installed may not be discontinued or materially modified by carriers without the approval of the Commission: . . ."

12. In *Terminal R. Ass'n v. Brotherhood of RR Trainmen*, 318 U.S. 1, 63 S.Ct. 420, 87 L.Ed. 571 (1943), the Supreme Court upheld a state regulation directing a terminal corporation to provide caboose cars for employees against a challenge of preemption. The Court held preliminarily that the Boiler Inspection Act, Safety Appliance Act and Interstate Commerce Act did not "by themselves and unimplemented by any action of the Interstate Commerce Commission" preclude the state regulation. In determining whether the regulation was preempted by the Railway Labor Act, Justice Jackson, speaking for a unanimous Court held:

"State laws have long regulated a great variety of conditions in transportation and industry, such as sanitary facilities and conditions, safety devices and protections, purity of water supply, fire protection, and innumerable others. Any of these matters might, we suppose, be the subject of a demand by workmen for better protection and upon refusal might be the subject of a labor dispute which would have such effect on interstate commerce that federal agencies might be invoked to deal with some phase of it. But we would hardly be expected to hold that the price of the federal effort to protect the peace and continuity of commerce has been to strike down state sanitary codes, health regulations, factory inspections, and safety provisions for industry and transportation. . . . We hold that the enactment by Congress of the Railway Labor Act was not a preemption of the field of regulating working conditions themselves and did not preclude the State of Illinois from making the order in question."

Id. at 6–7, 63 S.Ct. at 423. This language was cited by this Court in *Baltimore and O. R. Co. v. Com., Department of Labor and Industry*, 461 Pa. 68, 334 A.2d 636 (1975), where we held that while "the Railway Labor Act is clearly a comprehensive scheme of regulation, exclusive within its own province," there was no "unmistakable Congressional command to exclude state regulation of labor conditions affecting railroad employees." Id., 461 Pa. at 78, 82, 334 A.2d at 641, 643.

We disagree. While the broad language of the Act at one time could have been interpreted as reflecting Congressional intent to preempt the entire field of railroad safety, the enactment of section 205 of the Federal Railroad Safety Act in 1970 (FRSA) no longer permits that reading. Section 205 provides:

"A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary [of Transportation] has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce." [13]

The statutory language of section 205 clearly and unambiguously directs that states may regulate in the area of railroad safety until the Secretary of Transportation adopts a rule or regulation covering the same "subject matter."

Review of the legislative history of the FRSA conclusively supports this reading of the Act. The House Interstate and Foreign Commerce Commission Report, No. 1194, states:

"Over the years there have been several enactments of legislation dealing with certain phases of railroad safety. These include, among others, Safety Appliance Acts, Signal Inspection Act, Ash Pan Act, Locomotive [Boiler] Inspection Act, Accident Reports Act, and the Hours of Service Act. . . .

[T]he time is now here for broadscale Federal legislation with provisions for active State participation to assure a much higher degree of railroad safety in the years ahead. . . .

13. The parties agree that only the first sentence of section 205 is relevant to this case.

[U]ntil the Secretary acts with respect to a particular subject matter, a State may continue to regulate in that area. . . ."

2 U.S.Code Cong. and Admin.News, 91st Cong. (1970) pp. 4105, 4116.

Likewise, the Senate Commerce Committee Report, No. 619, 91st Cong., 2d Sess. 8–9 (1970) states:

"[Section 205] preserves from federal preemption two types of State power. First the States may continue to regulate with respect to that subject matter which is not covered by rules, regulations, or standards issued by the Secretary. All State requirements will remain in effect until pre-empted by Federal action concerning the same subject matter."

Congress could not have been more clear in its expression of intent. Until the "same subject matter" is preempted by action by the Secretary of Transportation, the states are free to regulate.[14] Appellee's claim of Congressional intent to the contrary must therefore be rejected.[15] See generally, *NLRB v. Robbins Tire and Rubber Co.*, 437 U.S. 214, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978) (literal language of statute governs).

Appellee N&W has not located any Transportation Department rule which covers the "same subject matter" of the PUC regulation—a requirement that locomotives be equipped with sanitary devices. Should the Secretary of Transportation promulgate such a regulation pursuant to the FRSA, there is no question that the state regulation would be superseded. Under the mandate of the FRSA, in

---

**14.** Under the FRSA, after the Secretary has acted with respect to a particular subject, states may still participate by submitting an annual certification to the Secretary. See § 206, FRSA. States may also aid in enforcement of federal regulations where the Secretary has not acted. See § 207.

**15.** Our reading of Congressional intent is consistent with the interpretation of § 205 by two federal courts of appeals. *National Association of Regulatory Utility Commissioners v. Coleman*, 542 F.2d 11 (3d Cir. 1976); *Donelon v. New Orleans*, 474 F.2d 1108 (5th Cir. 1973).

the absence of a federal rule covering the "same subject matter," we cannot, under section 205, infer preemption.

## III

■ Appellee N&W next contends that the PUC rule is preempted by the FDA regulations addressing discharge of untreated wastes onto roadbeds.[16] In deciding the preemptive effect of the FDA regulations, our inquiry must be the same. Federal law must clearly and unambiguously indicate an intention to exclude state regulation before preemption will be inferred. *Florida Lime and Avocado Growers, Inc. v. Paul,* supra; *Huron Portland Cement Company v. City of Detroit,* supra. Absent an intent to preempt the field, both the state and federal regulations must be enforced, so long as "federal superintendence of the field" is not impaired. *Florida Lime and Avocado Growers,* supra, 373 U.S. at 142, 83 S.Ct. at 1217. See also *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978); *Jones v. Rath Packing Co.,* 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977); *Hines v. Davidowitz,* 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941).

■ The FDA regulations in question here were promulgated pursuant to the Communicable Diseases Act, 42 U.S.C. § 264. This statute provides:

"Part G—Quarantine and Inspection

264. Regulations to control communicable diseases; apprehension, detention, and release of certain persons from particular places.

The Surgeon General, with the approval of the Secretary, is authorized to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession. For purposes of carrying out and enforcing such regulations, the Surgeon General may provide for

---

**16.** *See note 6, supra.*

such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary."

Although appellee maintains that "[t]his delegation of broad regulatory power evinces a Congressional intent to occupy the field," [17] we must disagree. We fail to see how this statutory provision can be construed as a broad grant of power, evidencing clear Congressional intent to preclude all state regulation. In any event, "Part B" of the Act, entitled "Federal-State Cooperation," indicates Congressional intent to the contrary:

"§ 243. General grant of authority for cooperation—Enforcement of quarantine regulations; prevention of communicable diseases

(a) The Secretary is authorized to accept from State and local authorities any assistance in the enforcement of quarantine regulations made pursuant to this chapter which such authorities may be able and willing to provide. The Secretary shall also assist States and their political subdivisions in the prevention and suppression of communicable diseases, shall cooperate with and aid State and local authorities in the enforcement of their quarantine and other health regulations and in carrying out the purposes specified in section 246 of this title, and shall advise the several States on matters relating to the preservation and improvement of the public health."

Since the scope of a regulation is defined by reference to the enabling legislation under which it is promulgated, see *Hospital Association of Pennsylvania v. MacLeod*, 487 Pa. 516, 410 A.2d 731 (1980), we must evaluate the FDA regulations in light of the communicable disease statute. The intent of the FDA regulations is to prevent the spread of communicable disease interstate by prohibiting the discharge of human waste material onto the right-of-way. The regulations do not require toilets or other sanitary devices

17. Brief for appellee at 27.

on trains. Rather, they direct only that where such devices are provided, human waste material may not be discharged onto the right-of-way unless suitably treated to prevent the spread of communicable diseases.

Appellees make much of the fact that the FDA "approved" the system prior to its installation. However, as stated earlier, the FDA's "approval" was limited. To the extent that the system as designed would not discharge waste onto the right-of-way, the system would comply with 21 C.F.R. § 1250.51. Moreover, the FDA did not inspect nor approve the system subsequent to its installation.

We therefore agree with the conclusion of the PUC that 52 Pa.Code § 33.62 is not preempted by the regulations of the Food and Drug Administration. As the PUC concluded,

"The purpose of 52 Pa.Code § 33.62 is to provide for the existence of flush toilets or similar devices on locomotives. Accordingly, 52 Pa.Code § 33.62 in no way impairs the federal superintendence of the communicable disease field and is not in conflict with the purposes of the regulations promulgated by the Food and Drug Administration." (Order, p. 10, R. 25a, 26a).

## IV

We are equally unpersuaded by appellee's contention that the PUC regulation creates an undue burden on interstate commerce. It is well-settled that states have the power to regulate commerce to advance legitimate local interests, so long as the burden on interstate commerce is not excessive. *Pike v. Bruce Church*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970); *Leisy v. Hardin*, 135 U.S. 100, 10 S.Ct. 681, 34 L.Ed. 128 (1889). In determining whether a state regulation creates an undue burden on commerce, it must first be determined whether the state regulation serves a legitimate state interest. As the United States Supreme Court stated in *Huron Portland Cement*:

"[T]he Constitution when 'conferring upon Congress the regulation of commerce, . . . never intended to cut the States off from legislating on all subjects relating to

the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country. [ . . .]' "

362 U.S. 440, 443–44, 80 S.Ct. 813, 816, 4 L.Ed.2d 852 (1960) (citing cases).

██  The Commonwealth clearly has a legitimate interest in insuring that sanitary devices on its railroad conveyances are maintained in a safe and healthful condition. Contrary to appellee's position, we do not find this interest in the health, safety and comfort of railroad employees and the public to be "insubstantial."[18]

Once a legitimate state interest is established, it is necessary to look to the degree of burden imposed by the regulation on interstate commerce. Appellee claims that the state regulation is unduly burdensome on two grounds: (1) the cost of compliance is excessive, and (2) the effect of the regulation extends beyond the boundaries of the Commonwealth.

As conceded by appellee, the cost of compliance alone is never a decisive factor. Such cost, however, may be relevant in determining whether the state's interest is outweighed by the burden imposed. *Pike v. Bruce Church*, supra. But we fail to see how compliance with the PUC requirement that appellee's trains be equipped with devices that operate in a sanitary manner necessarily involves "discarding presently installed equipment and installing new equipment at great additional expense."[19] If, as appellee claims, the "NW Sanitary Toilet System" is "sanitary and reliable," and the unsanitary conditions stem from "operational difficulties," then appellee should be able to comply with the PUC order by correcting what it terms "operational difficulties" without replacing the entire system.

Appellee also contends that the PUC regulation has an adverse extraterritorial effect. Appellee alleges that N&W carriers which interchange locomotive equipment with other

**18.** Brief for appellee at 37–40.

**19.** Brief for appellee at 35.

railroad companies would be precluded from moving through Pennsylvania if the other carriers' equipment does not comply with the PUC rule. This concern is unwarranted, as the PUC findings indicate that it is the "unique" N&W system ("no other railroad in the United States has a similar system" Finding No. 22), that presently does not dispose of waste in a sanitary manner.

Accordingly, we hold that compliance with the PUC order does not create an undue burden on interstate commerce.[20]

## V

Appellee's final contention is that the PUC finding that the N&W system does not sanitarily dispose of human waste material is not supported by substantial evidence.

▮▮▮ Our scope of review of an administrative agency is embodied in a recent statute:

"The court shall hear the appeal without a jury on the record certified by the Commonwealth agency. After hearing, the court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of Subchapter A of Chapter 5 (relating to practice and procedure of Commonwealth agencies) have been violated in the proceedings before the agency, or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. If the adjudication is not affirmed, the court may enter any order authorized by 42 Pa.C.S. § 706 (relating to disposition of appeals)."[21]

In the absence of an error of law or a violation of constitutional rights, "we examine the record only to determine if there is substantial evidence to support the order of the Commission." *PHRC v. Chester Housing Authority*, 458 Pa.

---

**20.** The PUC also found that "[n]o other state has regulations covering the same subject matter as 52 Pa.Code § 33.62" (Finding No. 24). Thus any concern that conflicting state regulations impose an undue burden on interstate commerce is, at most, speculative.

**21.** 2 Pa.C.S. § 704, effective June 27, 1978.

67, 327 A.2d 335, cert. den., 420 U.S. 974, 95 S.Ct. 1396, 43 L.Ed.2d 654 (1974); *D. F. Bast, Inc. v. Pa. PUC*, 397 Pa. 246, 250, 154 A.2d 505, 507 (1959); accord, *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978); *Pennsylvania Public Utility Commission v. Purolator Courier Corp.*, 24 Pa.Cmwlth. 301, 355 A.2d 850 (1976). Substantial evidence is that quantum of evidence which a reasonable mind might accept as adequate to support a conclusion. *Dutchland Tours, Inc. v. Pa. PUC*, 19 Pa.Cmwlth. 1, 337 A.2d 922 (1975). As this Court stated in *Blumenschein v. Pittsburgh Housing Authority*:

"[I]t has been established as an elementary principle of law that courts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion in the absence of bad faith, fraud, capricious action or abuse of power . . . . That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; *judicial* discretion may not be substituted for *administrative* discretion." (Emphasis in original).

379 Pa. 566, 573, 109 A.2d 331, 334–35 (1954). And more recently in *Commonwealth v. Beck Elec. Const. Co.*, 485 Pa. 604, 403 A.2d 553 (1979):

"Our courts must proceed with caution where the judgment of an administrative body properly interpreting its own regulation is at issue. As this Court stated in *State Dental Council and Examining Board v. Pollock*, 457 Pa. 264, 276, 318 A.2d 910, 917 (1974), '[t]he meaning to be given to terms of art in an agency regulation is particularly within the competence of that agency.' See *United States v. Larionoff*, 431 U.S. 864, 876, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977)."

485 Pa. at 614, 403 A.2d at 558.

■ Applying this standard of review, we are satisfied that the record supports the PUC's conclusion that the N&W system is not, in the language of § 33.62, a device "which sanitarily disposes of human waste matter."

## VI

As a final matter, we note that the order of the PUC entered July 6, 1977 states:

> "That after 120 days from date of service of this order, Norfolk and Western Railway Company cease and desist from operating any locomotives in the Commonwealth of Pennsylvania which are in violation of 52 Pa.Code § 33.62, in that said locomotives are not equipped with a flush type toilet or similar device."

It is the position of the PUC that the words "similar device" mean a "device which sanitarily disposes of human waste material," and we agree.

Accordingly, the order of the Commonwealth Court is reversed and the order of the PUC is reinstated.