634 A.2d 207

ARMCO ADVANCED MATERIALS CORPORATION
and Allegheny Ludlum Corporation

v.

PENNSYLVANIA PUBLIC UTILITY COMMISSION

Appeal of WEST PENN POWER COMPANY.

WEST PENN POWER COMPANY, Appellant

v.

PENNSYLVANIA PUBLIC UTILITY COMMISSION, Appellee.

ARMCO ADVANCED MATERIALS CORPORATION
and Allegheny Ludlum Corporation

v.

PENNSYLVANIA PUBLIC UTILITY COMMISSION

Appeal of PENNSYLVANIA PUBLIC UTILITY COMMISSION.

WEST PENN POWER COMPANY, Appellee,

v.

PENNSYLVANIA PUBLIC UTILITY COMMISSION, Appellant.

ARMCO ADVANCED MATERIALS CORPORATION
and Allegheny Ludlum Corporation, Appellants,

v.

PENNSYLVANIA PUBLIC UTILITY COMMISSION, Appellee.

WEST PENN POWER COMPANY

v.

PENNSYLVANIA PUBLIC UTILITY COMMISSION.

Appeal of ARMCO ADVANCED MATERIALS CORPORATION
and Allegheny Ludlum Corporation.

Supreme Court of Pennsylvania.

Argued Sept. 24, 1992.

Resubmitted May 27, 1993.

Decided Nov. 24, 1993.

Drew Kovalak, Michael D. McDowell, and John L. Munsch, West Penn Power Co., Greensburg, for appellant at No. 109 and appellees at Nos. 110 and 111.

John F. Povilaitis, Chief Counsel, Bohdan R. Pankiw and Lee E. Morrison, Pennsylvania Public Utility Com'n, Harrisburg, for appellant at No. 110 and appellees at Nos. 109 and 111.

James J. Flaherty, Thomas E. Boettger, and Michael E. Flaherty, Flaherty & Sheehy, P.C., Pittsburgh, for Milesburg Energy, Inc., appellee intervenor at No. 110.

David F. Boehm and Michael L. Kurtz, Boehm, Kurtz & Lowry, Cincinnati, OH, and Terrence F. McVerry, Grogan, Graffam, McGinley & Lucchino, P.C., Pittsburgh, for Armco Advanced Materials Corp. and Allegheny Ludlum Corp.

Clifford B. Levine and Alice B. Mitinger, Thorp, Reed & Armstrong, Pittsburgh, for Mon Valley Energy, Inc.

Marvin A. Fein and Philip Baskin, Houston Harbaugh, P.C., Pittsburgh, for North Branch Energy, Inc.

Tanya J. McCloskey and Phillip F. McClelland, Asst. Consumer Advocates, Harrisburg, for Irwin Popowsky.

Raymond J. Hoehler, Greensburg, for Burgettstown Project.

Before NIX, C.J., and LARSEN FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY, and MONTEMURO, JJ.

## ORDER

PER CURIAM.

Prior Report: 135 Pa.Commonwealth Ct. 15, 579 A.2d 1337.

Order affirmed.

NIX, C.J., and CAPPY and MONTEMURO, JJ., affirm.

FLAHERTY, ZAPPALA and PAPADAKOS, JJ., affirm in part and would reverse in part.

PAPADAKOS, J., files a concurring and dissenting opinion in which FLAHERTY and ZAPPALA, JJ., join.

LARSEN, J., did not participate in the decision of this case.

PAPADAKOS, Justice, concurring and dissenting.

I respectfully dissent to this court's decision to affirm by Per Curiam Order the decision and opinion of the Commonwealth Court. I believe that the Commonwealth Court was in error in its holding as to Phase I but correct as to Phase II as hereinafter explained.

This case arises under the ratemaking authority of the Pennsylvania Public Utility Commission ("PUC"). Ultimately this dispute originates in the fact that in 1978, Congress enacted the Public Utility Regulatory Policies Act of 1978 ("PURPA"), codified relevant to this case at 16 U.S.C. § 796(17)–(22) and 16 U.S.C. § 824a–3. PURPA *requires* that, amongst other things, regulated electric utilities offer to purchase electric energy from alternative power sources in the form of cogeneration and small power production facilities, thereby reducing this country's dependence on foreign oil and natural gas. PURPA also envisions the promotion of energy conservation and encourages the development of alternate energy sources. The Federal Energy Regulatory Commission ("FERC") subsequently issued regulations under the statute. See, 18 C.F.R. § 292, *et seq.* Under the statute and the regulations, qualified cogeneration and small power production facilities are referred to as qualifying facilities ("QFs") and must be certified by FERC as such. Congress, however, chose *state* regulatory authorities to be the prime enforcers of PURPA. The statute *requires* state regulatory agencies to implement FERC's rules in this area. This rather convoluted scheme of federal pre-emption was upheld by the United States Supreme Court in *Federal Energy Regulatory Commission v. Mississippi*, 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). The Pennsylvania Public Utility Commis-

sion has enacted its own regulations implementing FERC's PURPA regulations at 52 Pa.Code § 57.31, *et seq.*

While FERC has exercised its regulatory authority under PURPA to *require* a rate for certain utility purchases from QFs *equal* to "full avoided cost" (discussed further below), FERC regulations also permit (nay, encourage) utilities and QFs to negotiate agreements for utility purchases of power independently of the prescribed rates. 18 C.F.R. § 292.301. However, these agreements cannot be for amounts higher than the utility's "avoided costs."

Pursuant to this latter federal policy, West Penn Power Company ("West Penn") began negotiating on November 20, 1985, with Milesburg Energy, Inc. ("MEI") directly concerning MEI's proposal to refurbish an old West Penn power plant and create an electric generating facility fueled by bituminous coal refuse designed to provide up to 43 megawatts of power for a period of 30 years. This project is commonly known as the Milesburg Project and is located in Milesburg, Centre County, Pennsylvania. As of the date of this writing, and in the face of lengthy litigation, this project has yet to be built!

West Penn quoted rates for both capacity costs and energy costs for the purchase of power and MEI agreed to those rates on May 7, 1986, forming an agreement in principle on price. The rates were based on West Penn's own determination of its "avoided costs" and were calculated to be *at or below* its "avoided costs" as of May 7, 1986. FERC regulations define "avoided costs" as "the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or facilities, such utility would generate itself or purchase from another source." 18 C.F.R. § 292.101(b)(6). Unlike avoided energy costs, which are relatively stable and are not at issue in this appeal, avoided *capacity* costs, as will be seen below, can vary significantly over time. They are time dependent. The avoided *capacity* rate agreed to would have resulted in capacity payments of approximately $10 million per year by West Penn to MEI over the 30 year period for the purchase of electric power.

A further word about "avoided costs" is in order. Prior to PURPA, cogeneration and small power production facilities could not force utilities to purchase their electricity output and could only negotiate with utilities for the purchase of their power under the ordinary commercial circumstances of a willing buyer and a willing seller. In PURPA, Congress directed the FERC to set rates for utility purchases of power from QFs for ultimate resale to the utility's retail customers that are: (1) just and reasonable to the electric consumers of the utility and in the public interest; (2) not discriminatory against QFs; and (3) not to exceed the "incremental costs of alternative electric energy." 16 U.S.C. § 824a–3(b). PURPA defines the term "incremental costs of alternative electric energy" as the cost to the utility of electric energy which the utility would have generated or purchased from another source, absent the purchase from the QF. 16 U.S.C. § 824a–3(d). The concept of paying QFs the same or lesser amount as the utility would have charged for a like amount of power is commonly referred to as avoided cost pricing. 18 C.F.R. § 292.304. The Congressional intent of the avoided cost pricing scheme is to make the utilities' ratepayers economically indifferent between utility power plant additions and utility purchases of QF power.

> Under Section 210 of PURPA an electric utility's ratepayers are intended to be at least indifferent, in terms of the rates they pay, as to the source of power. In other words, the ratepayer is not to pay any more for power because the utility has purchased power from a QF rather than generating the power itself or purchasing power from another wholesale source. This is the purpose underlying the incremental cost ceiling on the rates utilities have to offer to purchase QF power.

Federal Energy Regulatory Commission, *Notice of Proposed Rulemaking: Administrative Determination of Full Avoided Costs, Rates for Sales of Power to Qualifying Facilities, and Interconnection Facilities,* Docket No. RM88–6–000 (March 16, 1988) at p. 7, (citing Conference Report on PURPA, H.R.Rep. No. 1750, 95th Cong., 2nd Sess. 98, reprinted in 1978

U.S.Code Cong. and Ad.News 7797, 7832); Summary of proposed rulemaking contained at 53 Fed.Reg. 9331 (March 22, 1988).

In other words, Congress sought to encourage the development of alternate energy sources provided that such development was not to be at all painful to either electric utilities or their ratepayers! "Avoided costs" therefore serve as a maximum price that QFs can charge utilities where the contract between the two is "freely" negotiated.

After further negotiations and based on their agreement in principle on price, MEI and West Penn voluntarily entered into an Electric Energy Purchase Agreement ("EEPA") dated February 25, 1987, whereby West Penn agreed to purchase electric power from the Milesburg Project (utilizing avoided *capacity* costs as of May 7, 1986) subject to certain terms and conditions. The EEPA contained a series of milestone dates designed to assure West Penn that satisfactory progress was being made on the project so that it could rely upon MEI's commitment to deliver power. One of the key milestone dates was the deadline for the closing of the initial construction financing of the Milesburg project (known as the "Financing Closing Date"). The EEPA provided that it would automatically terminate if the Financing Closing Date did not occur before September 1, 1988, for any reason whatsoever, including *force majeure*. A financing closing on the Project has not occurred to date. The parties also agreed in the EEPA that, as a condition precedent of West Penn's obligations to purchase power, the PUC must enter an order, final beyond appeal, establishing that the EEPA was in full compliance with the law and public policy, that the purchase of power would not result in excess capacity, and that all amounts paid by West Penn under the EEPA were consistent with law and could be immediately and fully passed through to its customers. This condition precedent was thought to be necessary because, as a public utility, West Penn cannot pass through to its customers any costs incurred under an EEPA without the authorization of the PUC.

On April 2, 1987, West Penn filed a petition with the PUC seeking an order declaring that the EEPA complied with PURPA and the Public Utility Code and that West Penn was authorized to pass through all costs incurred under the EEPA to its customers ("West Penn's Approval Petition"). Various parties intervened and the PUC in substance granted West Penn's petition without, however, holding open hearings on the matter. On appeal, the Commonwealth Court held that adequate notice to customers of the utility, and a fair opportunity to be heard—as required by due process, had not been given prior to PUC consideration of West Penn's Approval Petition. The Commonwealth Court remanded the matter for further proceedings that included the requirement that notice and an opportunity to be heard be afforded to West Penn's ratepayers. This decision of the Commonwealth Court was rendered on August 22, 1988, in *Barasch v. Pennsylvania Public Utility Commission,* 119 Pa.Commonwealth Ct. 81, 546 A.2d 1296 (1988), *reargument granted in part,* 119 Pa.Commonwealth Ct. 81, 115, 550 A.2d 257 (1988); now referred to as "Milesburg I." We denied further review, and the matter was returned to the PUC. On February 8, 1989, MEI filed a petition requesting the PUC to grant it relief from the Financing Closing Date and all other milestone dates in the EEPA ("MEI Modification Petition").

From April 3 through April 12, 1989, an Administrative Law Judge conducted an extensive PUC hearing (which produced a transcript of 1,475 pages) on both West Penn's Approval Petition (which came to be known as the "Phase I proceeding"), and on MEI's Modification Petition and related pleadings (which came to be known as the "Phase II proceeding"). The Administrative Law Judge issued his Recommended Decision on June 27, 1989, granting West Penn's Approval Petition but denying MEI's Modification Petition on the grounds that the EEPA between West Penn and MEI had lapsed and could not be modified (the lapse date being September 1, 1988).

On September 29, 1989, the PUC entered an Opinion and Order in this case, with one Commissioner dissenting, granting West Penn's Approval Petition (Phase I). With regard to

MEI's Modification Petition, the PUC agreed that the contract had lapsed but granted MEI its relief anyway (Phase II). In granting West Penn's Approval Petition, the PUC held to their previously announced policy in earlier cases involving voluntary agreement to the effect that "avoided costs" are to be determined as of the time of serious negotiations between parties. This was in agreement with the Administrative Law Judge's recommendation. In dealing with MEI's Modification Petition and a related petition of West Penn to withdraw its Approval Petition because the EEPA lapsed by its very terms, the PUC reversed the Administrative Law Judge's recommended decision and ordered, pursuant to its belief that it had general regulatory authority under the PURPA regulations to modify power purchase contracts between a utility and a QF, that West Penn enter into a new EEPA with MEI with terms and conditions identical to those in the former contract but with the first milestone date extended until six months after the entry of a final non-appealable order in this case with corresponding extensions of related milestone dates, all in accordance with the request by MEI.

West Penn appealed the Phase II portion of the Opinion and Order of the PUC to the Commonwealth Court arguing that the PUC's order improperly took a lapsed, voluntary PURPA contract and turned it into an involuntary PUC-ordered contract under terms contrary to the FERC's PURPA regulations.

Intervenors, Armco Advanced Materials Corporation and Allegheny Ludlum Corporation ("Armco/Ludlum"), two large industrial customers of West Penn, also jointly appealed the Opinion and Order of the PUC to the Commonwealth Court. They appealed the PUC's rulings on both West Penn's Approval Petition (Phase I) and MEI's Modification Petition (Phase II).

The Commonwealth Court consolidated the appeals and by a Memorandum Opinion and Orders filed July 17, 1990, affirmed in part and modified in part the PUC's Order entered September 29, 1989. The Commonwealth Court, in accord with Armco/Ludlum's argument, modified the PUC's approval

of the EEPA by requiring that the calculation of avoided *capacity* costs reflect factors in existence at the time the EEPA was executed (February 25, 1987), rather than at the time of serious negotiations between the parties (May 7, 1986). (Phase I). In addition, the Commonwealth Court affirmed the PUC's Order requiring West Penn to enter into a new, involuntary EEPA with MEI with an extended EEPA Financing Closing Date and with corresponding extensions in the related milestone dates.

The PUC has appealed the Commonwealth Court's modification of the Phase I portion of the PUC's order to this Court; and West Penn and Armco/Ludlum have appealed the Commonwealth Court's affirmance of the PUC's Phase II order.

We granted allocatur because at least part of the Commonwealth Court's decision appears to conflict with sound principles of administrative review enunciated by this Court. I will deal with Phase I and Phase II of the PUC order (and the Commonwealth Court's review thereof) separately.

### Phase I

As noted, the Commonwealth Court modified the PUC's approval of West Penn's Approval Petition in Phase I by holding that avoided *capacity* costs must be calculated as of the date the EEPA was formally executed, February 25, 1987, rather than at the time of serious negotiations between the parties (specifically as of the date an agreement in principle was reached on price—May 7, 1986). The Commonwealth Court based their conclusion on a reading of a FERC regulation, 18 C.F.R. § 292.304(d), discussed below. To further complicate matters, Armco/Ludlum now argues that the relevant calculation date is either September 29, 1989, the date when the PUC ordered West Penn to enter into a new transaction based on the original EEPA (which had expired according to its own terms); or, in the alternative, on the date MEI became certified as a QF, January 28, 1988. It is not readily apparent why this date selection question has been so bitterly litigated. However, a careful reading of the record and briefs in this case reveals the answer. Originally, Arm-

co/Ludlum argued for the February 25, 1987, date because two tax changes occurred prior to that date that they wanted incorporated into the calculation of the capacity credits for Milesburg, namely, the Tax Reform Act of 1986, effective in tax year 1987 and beyond, and a reduction in Pennsylvania Corporate Net Income Tax effective January 1, 1987. See, the PUC decision in this case, *Re: West Penn Power Company*, 106 PUR 4th 459, at 465, 1989 WL 418684 (1989). Although precise calculations are not available, picking the later 1987 date with the tax changes then in effect, Armco/Ludlum argues, would reduce the rates charged to utility customers as a result of the Milesburg project. Armco/Ludlum further argues that picking an even later date in 1988 or 1989 might effectively eliminate rate increases completely. See, Armco/Ludlum Appellants' brief at pp. 43–44. The self-serving shifting of dates by Armco/Ludlum for the calculation of avoided capacity costs emphasizes the correctness of the rationale employed by the PUC.

The PUC herein ruled that the avoided cost figures as of the time of *serious negotiations between the parties* should be used in determining the capacity rates for energy purchases by electric utilities from QFs. The PUC found that if it were to hold otherwise, avoided costs would become a constantly moving target, a phenomenon that would undermine contract negotiations that chill the continued development of cogeneration and small power production. 104 PUC 4th, at 464. This fear seems well founded. Moreover, the PUC adopted the Administrative Law Judge's position that no matter what point in time is used to fix rates, ratepayers will bear the risk that rates will go down and QFs will bear the risk that they will go up. Some point in time must be fixed and the PUC chose to continue to follow and to apply their "serious negotiations" rule, adopted in a case by case method and having been most recently enunciated and applied in *Pennsylvania Public Utility Commission v. Duquesne Light Co.*, 64 Pa.P.U.C. 388 (1987).

The Commonwealth Court thought that the *serious negotiations rule* (which made applicable the May 7, 1986, date when

an agreement on price was reached in principle between West Penn and MEI) should not be applied here because it conflicted with a FERC regulation at 18 C.F.R. § 293.304(d). The FERC regulation provides in part:

(d) Purchases "as available" or pursuant to a legally enforceable obligation. Each qualifying facility shall have the option either:

.     .     .     .     .

(2) To provide energy or capacity pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term, in which case the rates for such purchases shall, at the option of the qualifying facility exercised prior to the beginning of the specified term, be based on either:

(i) The avoided costs calculated at the time of delivery; or

(ii) The avoided costs calculated at the time the obligation is incurred. (Emphasis added).

The critical phrase, of course, is "legally enforceable obligation." It would be a rare person, indeed, who would argue that that phrase is susceptible of one and only one meaning, without nuance or variation, in every given situation. I think it can be reasonably argued that there is no conflict between the FERC regulation and the PUC's serious negotiations standard as applied in this case. We are not, after all, dealing with completely free enterprise. We are, rather, dealing with the twilight world of regulated monopolies. "[A utility's] obligation is not governed by common law concepts of contract law; it is created by statutes, regulations and administrative rules...." *Snow Mountain Pine Co. v. Maudlin,* 84 Or.App. 590, 598–599, 734 P.2d 1366, 1370; *review denied,* 303 Or. 591, 739 P.2d 571 (1987).

In this twilight world, one party may be bound to a contract while the other is not. While it is conceded by all that the May 7, 1986, agreement in principle on price did not bind MEI to go through with the deal, it did bind West Penn in that they were bound to that specific pricing system they agreed to in

principle once the contract was signed and, as Phase II of these proceedings makes clear, under PURPA, West Penn could be *compelled* by the PUC to enter into a contract on those agreed to prices at a later date, regardless of escape clauses or agreements to the contrary. MEI was in effect given an option when the agreement in principle on price was reached and while other contingencies had to be met, the agreement on price was firm and binding MEI's favor, otherwise why have it? It was essential that these prices be fixed at an early date so that MEI's development mortgage lender could calculate its cash flow to determine whether a mortgage on the property would be a sound investment. In short, while not a full contract, the agreement in principle on price did have a binding quality to it under these unique circumstances.

That is all that is necessary to bring the serious negotiations standard in compliance with the FERC regulation on "legally enforceable obligation" for *it is reasonable to argue, as noted above, that the two do not conflict.* Once that conclusion is reached, it falls primarily within the agency's discretion to interpret and apply its own rules and regulations. *Norfolk & W. Railway Co. v. Pennsylvania Public Utility Commission*, 489 Pa. 109, 413 A.2d 1037 (1980); *Commonwealth v. Beck Elec. Constr., Inc.*, 485 Pa. 604, 403 A.2d 553 (1979); *State Dental Council v. Pollock*, 457 Pa. 264, 318 A.2d 910 (1974). While I agree that here the PUC is applying federal regulations rather than their own, we think that the same rule must apply. The courts should refrain from making policy rulings for an agency unless the agency's acts are clearly illegal. That is not what occurred here. Court meddling with these types of questions invites the sort of lengthy litigation and delay that is so detrimental, particular in a case like this one.

For the reasons set forth above, I believe that the Commonwealth Court was in error not to defer to agency discretion in this matter and hence I would reverse the Commonwealth Court on this point and reinstate the PUC's decision to calculate avoidance costs as of May 7, 1986.

*Phase II*

The PUC agreed with their Administrative Law Judge that the Milesburg EEPA had lapsed according to its own terms. Nonetheless, the PUC held that despite the lapsed agreement, West Penn had a legally enforceable obligation to purchase power from MEI under the lapsed 1987 EEPA and at rates determined in accordance with West Penn's avoided costs calculated as of May 7, 1986, because such was mandated by Section 210 of PURPA, 16 U.S.C. § 824a–3. The Commonwealth Court affirmed finding that a negotiated contract conditioned on PUC approval is not a privately negotiated contract contemplated by 18 C.F.R. § 202.301, and that FERC has granted state public utility commissions broad authority under Section 210 of PURPA and that under that section a PUC has broad plenary power to order a utility to enter into a contract with a QF. Moreover, the Commonwealth Court concluded that a utility's submission of a contract with a QF to the PUC for approval is the legal equivalent to a petition by the QF to the PUC to compel the utility to enter into that contract. This all seems correct under PURPA, and we should not disturb the Commonwealth Court's conclusions in this matter. Under this theory giving plenary power to the PUC, the agency must order a rate equivalent to full avoided costs, 18 C.F.R. § 293.304(b)(2).

None of the parties to this appeal has challenged the fact that the PUC has done that by choosing to use the May 7, 1986, calculations in accordance with their "serious negotiations" rule. Hence, the PUC resolution of Phase II does not disturb their, and my, analyses under Phase I. Of course, under the plenary power given under PURPA, the PUC was free to order changes in some of the terms of the EEPA and this they did, including making changes in certain "milestone" dates. This they were entitled to do and I find no error here.

I would reverse the Commonwealth Court decision as to Phase I and affirm its decision as to Phase II.

FLAHERTY and ZAPPALA, JJ., join this concurring and dissenting opinion.