508 A.2d 605

Northampton, Bucks County, Municipal Authority, Appellant *v*. Bucks County Water and Sewer Authority, Appellee.

Northampton, Bucks County, Municipal Authority et al. *v*. Bucks County Water and Sewer Authority and Newtown Artesian Water Company and The Indian Rock Water Company, Inc., and FPA Corporation. Bensalem Township Authority, Appellant.

Argued December 12, 1985, before Judges MacPhail and Doyle, and Senior Judge Kalish, sitting as a panel of three.

*Gregory L. Sturn,* with him, *Stephen B. Harris, Harris and Harris,* for appellant/appellee, Northampton, Bucks County, Municipal Authority.

*Gary A. Rochestie,* with him, *Robert M. Greenberg, Rudolph, Seidner, Goldstein, Rochestie & Salmon, P.C.,* for appellant, Bensalem Township Authority.

*William J. Carlin,* with him, *John P. Koopman* and *Brenden E. Brett, Begley, Carlin & Mandio,* for appellee/appellant, Bucks County Water and Sewer Authority.

OPINION BY JUDGE MACPHAIL, April 23, 1986:

Appellants Northampton Municipal Authority (Northampton) and Bensalem Township Authority (Bensalem) appeal an order of the Court of Common Pleas of Bucks County dismissing Appellants' exceptions to an adjudication and decree nisi and entering the decree as a final decree.[1] We affirm.

Northampton filed a complaint in equity on July 23, 1984 against the Bucks County Water and Sewer Authority (Bucks). Northampton sought to invalidate a water supply contract between Bucks and the Newtown Artesian Water Company (Newtown Artesian). The agreement provided that Bucks would supply up to two million gallons of water per day to Newtown Artesian

---

[1] We consider here the consolidation of two appeals with two different docket numbers. One appeal was taken by Northampton and the other by Bensalem. On December 3, 1984, we issued an order consolidating both appeals.

Both Northampton and Bensalem state in their briefs that they are appealing both the final decree dismissing their exceptions and the Chancellor's order, entered orally before commencement of the trial, denying their petition for a continuance. Appeal will lie only from a final order, unless otherwise permitted by statute. *Pugar v. Greco*, 483 Pa. 68, 394 A.2d 542 (1978); *Roth v. Zoning Hearing Board of Springfield Township*, 91 Pa. Commonwealth Ct. 445, 497 A.2d 295 (1985). While Appellants may not raise the issue of whether a continuance should have been granted by directly appealing the Chancellor's interlocutory order, the issue has been, nevertheless, raised by the instant appeal. Our Supreme Court has held that in an equity proceeding a party may, from the filing of an adjudication and decree nisi, take exceptions to a chancellor's order concerning an interlocutory ruling. *United States National Bank in Johnstown v. Johnson*, 506 Pa. 622, 487 A.2d 809 (1985). The issue of whether the Chancellor should have granted a continuance was raised by Appellants in their exceptions to the Chancellor's adjudication and decree nisi and was addressed by the Chancellor in his opinion dismissing those exceptions. As such, the issue has been raised by the appeal to this Court from the Chancellor's final decree.

and that Newtown Artesian would pay for at least one million gallons per day whether the water was used or not. By instituting the suit, Northampton hoped to have the Court issue an injunction halting Bucks from building a 30-inch water main through Northampton Township from Buck's Siles pumping station to Buck Road and Chinquapin Road and a 24-inch main from that location to a point near Buck Road and the Neshaminy Creek.

The Chancellor permitted Middletown Township (Middletown) and Bensalem to intervene as plaintiffs. All of the plaintiffs involved in the case purchase water from Bucks. They claim that the water main extensions and the Newtown sales contract would result in higher water rates for the water they purchase from Bucks. The Chancellor permitted Newtown Artesian, the Indian Rock Water Co., Inc.—a wholly owned subsidiary of Newtown Artesian—and FPA Corporation (FPA) to intervene as defendants.

The Chancellor by decree nisi denied the relief sought by Northampton, Middletown and Bensalem on August 10, 1984. The Chancellor confirmed the decree nisi and dismissed exceptions filed to it on October 19, 1984. Northampton and Bensalem have appealed to this Court.

This Court's scope of review when considering an appeal from a dismissal of exceptions to a chancellor's order in an equity proceeding is limited to determining whether the chancellor's findings are supported by substantial evidence, whether an error of law was committed, or whether the chancellor abused his discretion. *Babin v. City of Lancaster*, 89 Pa. Commonwealth Ct. 527, 493 A.2d 141 (1985).

*Challenges Under Subsection 4B(h)*

Appellants argue that the Chancellor erred in finding that the contemplated construction and its financing

would not violate Subsection 4B(h) of the Municipality Authorities Act of 1945 (Act), Act of May 2, 1945, P.L. 382, *as amended*, 53 P.S. §306B(h). We find that the Chancellor did not so err because the Appellants failed to prove that Bucks' plans would violate the Act.[2]

The relevant portion of Subsection 4B(h) grants a municipal authority the power

> to determine by itself exclusively the services and improvements required to provide adequate, safe and reasonable service, including extensions thereof, in the areas served: Provided, That if the service area includes more than one municipality, the revenues from any project shall not be expended directly or indirectly on any other project, unless such expenditures are made for the benefit of the entire service area. Any person questioning the reasonableness or uniformity of any rate fixed by any Authority or the adequacy, safety and reasonableness of the

---

[2] Northampton argues in its brief before this Court that the Chancellor erred by assigning the burden of proof to the Appellants to demonstrate that Bucks' plans fail to comply with the requirements of the Act. Northampton further argues that the Chancellor should have assigned the burden to Bucks to prove that its plans *did* comply with the Act.

Northampton also argues that while it is true that it had the burden of proving that Bucks had abused its *discretion* under the Act, Bucks had the burden of proving that it *complied* with the clear requirements of the Act. We decline Northampton's invitation to split the burden of proof in such a manner. Municipal officers are presumed to have acted properly for the public good. *Whitemarsh Township Authority v. Elwert*, 413 Pa. 329, 196 A.2d 843 (1964); *City Firefighters' Association v. City of Philadelphia*, 65 Pa. Commonwealth Ct. 283, 442 A.2d 393 (1982). Applied to the case *sub judice*, this principle leads to the conclusion that Bucks must have been presumed to have complied with the Act. Hence, it was Appellants' burden to prove otherwise. The Chancellor properly assigned the burden of proof.

Authority's services, including extensions thereof, may bring suit against the Authority in the court of common pleas of the county wherein the project is located. . . . The court of common pleas shall have exclusive jurisdiction to determine all such questions involving rates or service.

It is not disputed that Bucks' service area includes more than one municipality. Appellants assert that Bucks lacks the power under Subsection 4B(h) to construct the new water mains because revenues from other projects from areas not benefited by the construction of the new water mains will be expended upon it. We must reject this assertion.

The Chancellor found, which finding is supported by substantial evidence, that the water main extensions are self-sustaining. The Chancellor stated that he accepted Bucks' estimates as credible that there will be revenue benefits and cost savings from the extensions. The Chancellor based his finding on exhibit BCWS-10, entitled "Comparison of Water Expense With or Without Newtown Artesian Water Company Extension Over Life of Project," and the testimony of Harold D. Sursa, the Executive Director of Bucks. The Chancellor found Mr. Sursa's testimony to be credible while rejecting testimony to the contrary. The Chancellor did not abuse his discretion by doing so.[3]

---

[3] Northampton argues that the Chancellor did err in accepting Mr. Sursa's testimony and rejecting the testimony of other witnesses as to cost projections and estimates of revenues because all of the figures presented by both parties were based upon Mr. Sursa's figures. Northampton seems to be saying that once the Chancellor accepted Mr. Sursa's figures, he was required to also accept any and all conclusions and opinions based upon the figures. Indeed, any number of conclusions could be drawn, many of them directly contradictory. The Chancellor chose to accept Mr. Sursa's explanations as to what his figures mean. In doing so the Chancellor did not err.

Appellants argue that the Chancellor erred in concluding that the extensions will be self-sustaining because that conclusion, as well as Mr. Sursa's testimony, is based on several erroneous assumptions. Mr. Sursa testified that in the first year the total revenue gain to Bucks from the extensions would be $91,147, in the second year $79,562, in the third $67,977, in the fourth $79,726 and in the fifth $103,143.[4] Appellants aver that the project will actually lose money in the first several years because Bucks will be required to pay $215,285.00 a year in debt service the first four years and $315,285.00 the fifth year, while Mr. Sursa in Exhibit BCWS-10 assumes that the debt service will be $190,000.00 a year. Mr. Sursa averaged the debt service over the repayment period to come up with the figure of $190,000.00 per year.

We find no error in Mr. Sursa's calculations or in the Chancellor's acceptance of them. Bucks' argument is well taken that if an averaging of the debt service were not permitted, a project would not be self-sustaining and would violate Subsection 4B(h) if it lost $100.00 in the first five years due to the high initial debt service and then went on to make $1,000,000 in the next thirty-five years. We must recognize that if the debt service were not averaged, and a year-by-year analysis of net revenue were applied, many beneficial projects would show a loss in the early years even though, using the same analysis, they would show large revenue gains in the future. Subsection 4B(h) must not be interpreted so rigidly as to preclude the construction of projects which a municipal authority, in its discretion, deems to be beneficial.

Appellants further attack the Chancellor's conclusion because the Chancellor found that Newtown Artesian

---

[4] Notes of testimony from August 8, 1984 at II-154, R.R. at 605a; Exhibit BCWS-16, R.R. at 1157a.

will require over 125 million gallons per day of water in less than five years from the commencement of the forty-year agreement. However, this finding is supported by substantial evidence in the form of testimony by William H. McCormick, general manager of Newtown Artesian.[5] Even so, this finding by the Chancellor does not affect the conclusion that the extensions are self-sustaining one way or the other. Mr. Sursa's testimony is to the effect that even at a consumption by Newtown Artesian of as low as 650,000 gallons per day, the extension would still yield a total revenue gain.[6]

Appellants also allege that Mr. Sursa's testimony was in error because in calculating the total revenue gain, he took into consideration estimated gains in revenue the extensions would yield, aside from the consumption by Newtown Artesian.[7] These gains would derive from a net reduction in the cost of operating a well which could be abandoned and from increased water sales in Upper Southampton and Lower Southampton due to increased water pressure. Appellants aver that the Chancellor was in error in accepting these estimates. There was conflicting testimony on the matter, and the Chancellor chose to accept Mr. Sursa's estimates. That was the Chancellor's prerogative.

Appellants also attack Mr. Sursa's calculations by asserting that Mr. Sursa did not set rates so that the extensions would be self-sustaining, without taking into consideration yields from revenues other than consumption by Newtown Artesian, at one million gallons of consumption per day by Newtown Artesian as he testified. Appellants also claim that the unit cost figure generated by Mr. Sursa for use in his calculations should have

---

[5] Notes of testimony from August 8, 1984 at II-101 to II-102, R.R. at 552a—553a; Exhibit BCWS-6, R.R. at 1144a.

[6] Exhibit BCWS-16; R.R. at 1157a.

[7] *Id.*

been deducted from projected revenues to arrive at a net revenue figure. Our review of the relevant exhibits reveals that both of these assertions are unfounded.

Even if the Chancellor had been incorrect in finding that the sewer main extensions were self-sustaining, his conclusion that Bucks did not violate Subsection 4B(h) could be upheld on another basis. The Chancellor concluded that the entire Southwest Region Water System of Bucks, of which the proposed extensions would be a part, should be considered the "project" for purposes of Subsection 4B(h). We note that Bucks operates several water systems within Bucks County. The Chancellor's conclusion is not an error of law and is supported by the evidence. Previous trust indentures of Bucks introduced into evidence, as well as the proposed supplemental trust indenture for the project at hand,[8] all identified as a "project" of Bucks "the construction and acquisition of a comprehensive water system to serve the southwest region of Bucks County." Further, Mr. Sursa testified that Bucks viewed the Southwest Water System as an integral project and that the extension of the lines in question were part of the original plan concept for the water system, so as to serve its intended purpose of supplying water to the entire southwest portion of Bucks County.[9]

Appellants argue that revenues from municipalities within the Southwest Water System that will not be benefited by the extension will be used to pay for the construction. However, the Chancellor correctly found that all those municipalities are served by one project, the Southwest Water System. Therefore, revenues from those municipalities are not being expended on another project and Subsection 4B(h) is not violated.

---

[8] Exhibits P-4, P-5 and P-6, R.R. at 991a to 1037a.

[9] Notes of testimony from August 8, 1984 at II-125, R.R. at 576a.

Appellants also argue that even if the "project" is the entire Southwest Water System, the "service area" of Bucks for purposes of Subsection 4B(h) includes not only the Southwest Water System, but all the other systems Bucks operates as well. They note correctly that the Chancellor was unclear as to what the proper definition of "service area" should be. We hold that, as a matter of law, "service area" must be defined to include all of Bucks' various systems.

With the definition of "service area" established, another of Appellants' arguments becomes important. Appellants note that revenues from both the Southwest Water System and the Neshaminy Sewer Interceptor System, another system Bucks operates which services different areas from those served by the Southwest Water System, are being pledged to satisfy the bonds to be issued to finance the water main extensions. Appellants aver that this amounts to an indirect expenditure of revenue from one project on another project which does not benefit the entire service area, hence running afoul of Subsection 4B(h). One need only look to two other Subsections of the Act to find Appellants' arguments unavailing.

Subsection 4B(m) of the Act, *as amended,* 53 P.S. §306B(m), gives municipal authorities the power

> [t]o pledge, hypothecate or otherwise encumber *all or any of the revenues or receipts* of the Authority as security for *all or any of the obligations* of the Authority. (Emphasis added.)

Subsection 5(B) of the Act, *as amended,* 53 P.S. §307(B), provides that

> [a]ny resolution or resolutions authorizing any bonds may contain provisions which shall be part of the contract with the holders thereof, as to . . . pledging the *full faith and credit* of the Authority . . . for such obligations, or restricting

the same to *all or any of the revenues of the Authority from all or any projects or properties....* (Emphasis added.)

These two Subsections clearly give Bucks the power to pledge the revenues from any of its projects to repay the bonds issued to finance the water main extension. Pledging the revenues from the Neshaminy Sewer Interceptor to repay the bonds must not, in light of the two foregoing Subsections, be considered a direct or indirect expenditure of revenues from one project to another in violation of Subsection 4B(h). The Act expressly gives Bucks the power to pledge the revenues in such a manner, regardless of what municipalities the projects involved benefit.

We conclude that the Chancellor did not err when he found that the contemplated construction and its financing did not violate Subsection 4B(h) of the Act.[10]

*Challenges Under Subsection 4B(p)*

Subsection 4B(p) of the Act, *as amended,* 53 P.S. §306B(p), provides that municipal authorities have the power

[t]o enter into contracts to supply water and other services to and for municipalities that are not members of the Authority, or to and for the Commonwealth of Pennsylvania, municipalities, school districts, persons or authorities, and fix the amount to be paid therefor.

---

[10] Appellant Northampton further argues that the Chancellor erred in finding that the extensions would benefit the entire service area. We need not decide if the Chancellor erred on this point because it is irrelevant to our decision. We have defined, as did the Chancellor, the entire Southwest Region Water System as one "project." Appellants did not present any evidence that any revenues outside of the Southwest Region Water System would be expended on the extensions other than the pledging of revenues from the Neshaminy Sewer Interceptor System to secure the bonds. We have already held that this is permissible.

Section 2 of the Act, *as amended,* 53 P.S. §302, states in pertinent part:

> The following terms whenever used or referred to in this act shall have the following meanings, *except in those instances where the context clearly indicates otherwise:*
>
> . . . .
>
> (i) The term 'persons' shall mean and include natural persons. (Emphasis added.)

We agree with Appellants' assertion that the only category of Subsection 4B(p) which would apply to Newtown Artesian, being a private corporation,[11] is "person." We would also agree that a privately-owned public utility, while being a person, is not a "natural person." We do not agree, however, that these Subsections of the Act prohibit Bucks from selling water to Newtown Artesian.

Subsection 4B(p) of the Act must be interpreted in light of the Subsection which it follows, Subsection 4B(o), *as amended,* 53 P.S. §306B(o), which gives municipal authorities the power

> [t]o contract with any municipality, *corporation,* or any public Authority of this or any adjoining state, on such terms as the said Authority shall deem proper, for the construction and operation of any project which is partly in this Commonwealth and partly in such adjoining state. (Emphasis added.)

The context of Subsection 4B(p), in that it follows Subsection 4B(o), clearly indicates that "persons" as used in Subsection 4B(p) is meant to include "corporations." The legislature could not have intended to give municipal authorities the right to contract with

---

[11] Notes of testimony from August 8, 1984 at II-4, R.R. at 455a.

corporations concerning projects which are partly in the Commonwealth and partly within another state, while withholding that power when the project is contained solely within the Commonwealth.

Laying the statutory contextual analysis aside, we find that the Public Utility Code (Code), 66 Pa. C. S. §§101-3315, and the cases decided under it give recognition to the validity of water-supply contracts between municipal authorities and privately-owned public utilities.

The term "public utility" is defined in the Code, in pertinent part, as follows:

> (1)   Any person or corporations now or hereinafter owning or operating in this Commonwealth equipment or facilities for:
>
> . . . .
>
> (ii)   Diverting, developing, pumping, impounding, distributing, or furnishing water to or for the public for compensation.[12]

Section 507 of the Code, 66 Pa. C. S. §507, provides for Public Utility Commission approval of a public utility-municipal corporation contract:

> *Except for a contract between a public utility and a municipal corporation to furnish service at the regularly filed and published tariff rates,* no contract or agreement between any public utility and any municipal corporation shall be valid unless filed with the commission at least 30 days prior to its effective date. (Emphasis added.)

In *Virgilli v. Southwestern Pennsylvania Water Authority,* 58 Pa. Commonwealth Ct. 340, 427 A.2d 1251 (1981), this Court held *en banc* that the emphasized portion of Section 507 exempted from PUC approval a

---

[12] Section 102 of the Code, *as amended,* 66 Pa. C. S. §102.

contract between a municipal authority created under the Act and a privately-owned public utility for the municipal authority to supply the utility with water.

Under the Code, contracts such as the one we are considering in the case *sub judice* are recognized as being valid, even without PUC approval.[13] The Chancellor did not err when he failed to find that the contract between Bucks and Newtown Artesian was illegal under Subsection 4B(p) of the Act.

### The Method of Financing

Appellants attack the utilization of Tax Exempt Note Rate (TENR) Bonds to finance the proposed water main extensions. The Chancellor found, and it is supported by substantial evidence, that TENR bonds supply a flexible financing method where the borrowings are refundable and supported by strong bank letters of credit. He concluded that Bucks did not abuse its discretion by choosing to finance the extensions in this manner.

Although not noted by any of the parties, the Act sets forth mandatory guidelines for the issuance of bonds by a municipal authority at Subsection 4B(i), *as amended,* 53 P.S. §306B(i), and Section 5, *as amended,* 53 P.S. §307. There was no evidence presented which would indicate that Bucks' financing plans would breach any of the requirements of the Act. In making this observation, we note that the interest rate on the TENR bonds will fluctuate slightly and that Section 5 of the Act requires that the interest rate payable on any bond issued by a municipal authority must not exceed six per cent per annum. The Chancellor made findings that the average interest rate of TENR bonds since their incep-

---

[13] Curiously, the water supply agreement between Bucks and Newtown Artesian was given approval by the PUC in an order entered July 6, 1984, even though under the *Virgilli* case approval would appear unnecessary, since Bucks would, under the agreement, supply water to Newtown Artesian at its regular rate.

tion in January of 1982 to the time of the hearing was 6%. The Chancellor based his finding on Exhibit P-6,[14] a form of such bonds, and Exhibit P-23,[15] a schedule setting forth weekly interest rates for the TENR bonds. Indeed, the latest interest rate for TENR bonds listed on Exhibit P-23 is 6.000% as of August 2, 1984.

It is true that the Chancellor found that Bucks' effective interest rate, with a TENR charge adjustment, letter of credit charges by Fidelity Bank and Credit Suisse and remarking charges, would be about 8%. The Act provides only that the bonds should not bear an interest rate over six per cent per annum; it says nothing about the other charges involved. The evidence indicates that the bonds themselves would not bear an annual rate over six percent.[16] We conclude that Appellants did not meet their burden of showing that Bucks would violate any of the requirements of the Act in connection with its planned bond issue.

Appellants have also argued that financing via TENR bonds is not as wise or prudent as using some other forms of financing. As long as Bucks follows the guidelines of the Act, precisely what type of financing to use is within its discretion. It is well settled that courts will not review the actions of governmental bodies involving acts of discretion in absence of bad faith, fraud, capricious action or abuse of power; the fact that the court may have a different opinion or judgment is of no matter because judicial discretion may not be substitut-

---

[14] R.R. at 991a.

[15] R.R. at 1106a.

[16] Our own calculations from Exhibit P-23 reveal the average interest rate on TENR bonds between January 21, 1982 and April 5, 1984 to be 5.982%. It is interesting to note that the last day on the schedule on which the TENR Bond interest rate was above 6% was September 16, 1982.

ed for administrative discretion. *Norfolk and Western Railway Co. v. Pennsylvania Public Utility Commission*, 489 Pa. 109, 413 A.2d 1037 (1980); *South Union Township Sewage Authority v. Kozares*, 13 Pa. Commonwealth Ct. 325, 320 A.2d 381 (1974).

The Chancellor did not err in not finding that the financing of the water main extensions by TENR bonds was improper.

*The "Public Purpose" of the Water Main Extension*

Appellants argue that the water main extensions will essentially be used for a private, not a public, purpose and that therefore the Chancellor should have enjoined construction.

Appellants admit that one of the extensions, which would consist of a 30-inch water main, can be said to serve a public purpose because it will increase water supply and pressure to Northampton, Lower Southampton and Upper Southampton Townships. The Appellants assert, however, that the portion of the project consisting of a 24-inch main which would supply water from the 30-inch water main to Newtown Artesian's franchise area is for a private purpose. Under the terms of the agreement between Newtown Artesian and Bucks, Bucks would, at its expense, extend its facilities via the 24-inch main to the edge of Newtown Artesian's franchise area.[17] Newtown Artesian would extend its facilities out to that point in order to be able to receive the water.[18] Under an agreement between Newtown and FPA, a housing developer, FPA would pay the costs of that extension.[19] FPA would also pay to extend Newtown Artesian's facilities to FPA's new Golden Acre development.[20]

---

[17] Exhibit P-1, R.R. at 874a.

[18] *Id*.

[19] Exhibit P-2, R.R. at 883a-888a.

[20] *Id*.

Appellants aver that the 24-inch main Bucks is building is for a private purpose because under the Newtown Artesian-FPA contract, FPA has the first right to a substantial portion of the water which will be provided to Newtown Artesian. The relevant portion of the Newtown Artesian-FPA contract reads:

5. *Reserve of Water Supply for Developer*

A. The Company agrees that it will reserve subject to the limitations in paragraph 5B below, that amount of water necessary—(Average Daily amount of 558,792 gallons and Peak Daily amount of 838,188 gallons per Boucher and James letter dated 11 January 1983) to service Developer for a period of fifteen years from the completion of work as defined in Paragraph 4B herein above. Further the Company agrees that it will also reserve 500,000 gallons of storage capacity for this Developer for a period of fifteen years from the completion of work as defined in Paragraph 4B herein above.[21]

The Bucks-Newtown Artesian contract provides that Bucks agrees to supply up to two million gallons of water per day to Newtown Artesian, with Newtown Artesian agreeing to purchase a minimum of one million gallons a day.[22] Newtown Artesian anticipates that initially it will require 650,000 gallons a day from Bucks.[23] Under the Newtown Artesian-FPA contract, FPA agrees to reimburse Newtown Artesian the cost of the 350,000 gallons a day it will be required to pay for but which it will not use, at least initially.[24]

Appellants argue that the 24-inch water main should be considered a project for private benefit because all of

---

[21] Exhibit P-2, R.R. at 888a.

[22] Exhibit P-1, R.R. at 875a.

[23] Exhibit P-2, R.R. at 882a.

[24] *Id.*

the water flowing through it will be sold to Newtown Artesian, a privately-owned public utility, which in turn will sell most of the water to inhabitants of homes built by FPA, a commercial developer. In making their arguments, Appellants rely on *Price v. Philadelphia Parking Authority*, 422 Pa. 317, 221 A.2d 138 (1966). In that case, our Supreme Court ruled that the Philadelphia Parking Authority entered into an agreement which was beyond its power. The agreement had the Parking Authority buying a private developer's land and constructing a public garage on it. The authority would then lease the garage back to the developer who would operate it; who could also use or sublet to private commercial enterprises substantial portions of ground and basement levels; who would lease air space above the garage for a high rise apartment complex; and who would have an exclusive option to purchase the land and the garage.

The factual differences between this case and the *Price* case are obvious. The agreement between the authority and the private developer in *Price* served to much more intertwine the two than is the case here. All that Bucks has agreed to do is build a water main and sell water. There is no purchase of land development, lease-back or option to buy involved. Further, Bucks is selling the water to a *public* utility, albeit privately-owned, which is regulated for the public good by the PUC, and the water sold to Newtown Artesian will be available to the general public. A municipal authority should be permitted to sell water to such utilities without the sale and necessary construction of facilities being considered projects solely for private benefit. *See Sullivan v. County of Bucks*, 92 Pa. Commonwealth Ct. 213, 221, 499 A.2d 678, 684 (1985).

It is true that homes built by FPA, a private developer, will initially consume most of the water Bucks supplies to Newtown Artesian. However, the inhabitants of these homes will be, nevertheless, members of the general public. The fact that they will

live in houses built by one developer does not render them less so. Without the water main extension, the inhabitants of some 1,751 planned residential dwellings will be without a source of public drinking water. It is clear that providing those homes with such water is for the public benefit.

We conclude that the Chancellor did not err in not finding that the water main extensions would be for a private purpose.

### Challenges Under Subsection 4A

Appellants aver that the proposed water main extensions run afoul of the following portion of Subsection 4A of the Act, *as amended,* 53 P.S. §306A:

> none of the powers granted by this act shall be exercised in the construction, improvement, maintenance, extension or operation of any project or projects which in whole or in part *shall* duplicate or compete with *existing* enterprises *serving* substantially the same purposes. (Emphasis added.)

Peter Anderson, Northampton's Executive Director, testified that Northampton currently has transmission mains connected to Newtown Artesian which are currently transporting only 100,000 gallons per day but which are capable of transporting two million gallons per day.[25] The water so transported has as its source Bucks.[26] In order for Northampton to deliver two million gallons per day to Newtown Artesian, Bucks would have to build additional transmission mains to Northampton and furnish it with the additional water.[27] The Chancellor found that, even in the light of Mr. Anderson's testimony, the planned construction would not violate Subsection 4A of the Act. We agree.

---

[25] Notes of Testimony from August 7, 1984 at I-46 to I-54, R.R. at 282a to 290a.

[26] *Id.*

[27] *Id.*

Appellants fail to recognize that the plain wording of the statute is such that it prohibits projects which *"shall* duplicate . . . *existing* enterprises *serving* substantially the same purposes."* This clause of the statute is phrased in the present tense, it is not worded in such a manner that what Northampton could *possibly* do is in any way relevant. It is undisputed that Northampton is not currently providing through its facilities any kind of service that serves substantially the same purpose that the planned water main extensions would.

Further, there was evidence presented that by the year 2010, Newtown Artesian will require Bucks to supply it nearly five million gallons per day.[28] Mr. Anderson testified that Northampton would be unable to provide that quantity of water and also meet its own future needs.[29] What Bucks was faced with in deciding to build the water main extensions was whether to build one extension to Northampton's facilities which would become obsolete well before the year 2010, or to spend more money to build two extensions that would not become obsolete until after 2010 and which would benefit Bucks' entire Southwest Water System. Such a decision by a municipal authority should not be disturbed if it is reasonable and will not be interfered with by the courts in absence of an abuse of discretion, fraud, misconduct or arbitrary and capricious action. *See Lakemont Civic Association v. Central Blair County Sanitary Authority,* 199 Pa. Superior Ct. 125, 184 A.2d 301 (1962). We find none of these in this case.

The Chancellor did not err by not finding that Bucks would violate Subsection 4A of the Act by building its planned water extension.

---

[28] Notes of Testimony from August 8, 1984 at II-101, R.R. at 552a; Exhibit P-1, R.R. at 873a.

[29] Notes of Testimony from August 7, 1984 at I-113, R.R. at 349a.

## Procedural Challenges

In addition to attacking the decision of the Chancellor on the substantive grounds discussed above, Appellants attack the Chancellor's decision on a host of procedural grounds.

First, Appellants aver that the Chancellor erred in denying the Appellants' petition for a continuance.

The decision of whether to grant a continuance is a matter within the discretion of the trial court and will not be disturbed on review absent a manifest abuse of discretion. *Swartz v. Pittsburgh Public Parking Authority*, 63 Pa. Commonwealth Ct. 434, 439 A.2d 1254 (1981). Appellants assert that because the discovery phase of the trial was limited to only two days, they did not have sufficient time to complete discovery. They assert that they were prejudiced by their inability because of time constraints to adequately review all relevant documents and to present an expert witness on the subject of bond financing, and by the fact that Newtown Artesian's Executive Director, Mr. McCormick, was not available for deposition prior to the trial, even though Appellants did have the opportunity to interview him before he testified.

We rule that the Chancellor did not abuse his discretion in refusing a continuance. The Chancellor stated:

> With reference to trial preparation time, we felt at trial and still feel that although the trial was scheduled promptly, all counsel and their clients had an adequate time to prepare their cases. The initial water supply contracts were signed on June 7, 1984, more than two months before the trial date. After July 16, 1984, the proposed method of financing with TENR bonds was available for public inspection, draft borrowing resolutions had been prepared by bond

counsel, a . . . [Bucks] Board of Directors meeting had been scheduled for August 9, 1984 to act on the resolutions and construction bids were expected on July 24, 1984. . . .

In exercising our discretion we believed that it was necessary to balance the interests of the defendant authority, utility and developer in having their major construction and financing plans adjudicated promptly against the interests of plaintiffs in developing their cases. We also were aware of the ease with which it is frequently possible to stop bond issues and public construction projects by the *fact* of litigation without regard to the *merits*. Here we note that bond counsel has instructed (Ex. P-10, p. 2) that : 'The entry into the contract [for construction] is a condition of the issuance of Bonds under the relevant Bond Indenture.' When asked whether the bond issue could close and the contracts could go forward with the litigation hanging over the head of the authority, bond counsel stated (N.T. I-186) that '. . . a serious question is raised by the litigation but we haven't reached a final determination of what we will do.'

. . . .

Next, as to Bensalem's argument that we closed the record without giving it an opportunity to present an expert witness to testify as to the advisability of TENR bond financing, counsel was unable to identify who the witness was or precisely what he would testify to, if called. He merely stated (N.T. II-77): 'I have in mind someone, but I've been incapable of procuring the services. He is away. I have spoken to him by telephone, or I've had—my firm has spoken to him by telephone. I have not.' He also con-

ceded that the unidentified expert had not made any study of the documents related to the project. (N.T. II-77) Under the circumstances, we felt that it would have been unfair to defendants to stop the trial.

*Northampton, Bucks County Municipal Authority v. Bucks County Water and Sewer Authority,* (No. 84-5036-12-5 Court of Common Pleas of Bucks County—Civil, filed October 19, 1984), slip op. at 12-14 (emphasis in original).

We further note that the granting of a continuance is governed by Pa. R.C.P. No. 216. The rule sets forth three grounds for a continuance, two of which have no relevance here. The third ground is relevant:

(3)  Inability to subpoena or to take testimony by deposition, commission, or letters rogatory, of any material witness, shown by affidavit which shall state:

(a)  The facts to which the witness would testify if present or if his deposition should be taken;

(b)  The grounds for believing that the absent witness would so testify or give his deposition;

(c)  The efforts made to procure the attendance or deposition of such absent witness; and

(d)  The reasons for believing that the witness will attend the trial at a subsequent date, or that his deposition can and will be obtained[.]

Our review of the record reveals that Appellants submitted no such affidavit for either Mr. McCormick or the unnamed expert. Therefore, the Chancellor's failure to grant a continuance because of any failure to depose Mr. McCormick or to present the testimony of an expert cannot be considered error.

As to the alleged lack of time to complete discovery, that is not one of the specific grounds mentioned in Pa.

R.C.P. No. 216. However, that rule does provide that a continuance may be granted by "[s]uch special ground as may be allowed in the discretion of the court." As we have pointed out above, we do not believe that the Chancellor abused his discretion in refusing a continuance.

Appellants also allege that the Chancellor violated Bucks County Local Rule *257.[30] That Rule states:

> The court, or any judge thereof, in its or his discretion, upon motion of any party in interest, or upon its own motion, may by special order fix the trial of particular equity cases, or cases to be tried by the Court without a jury, or the argument of particular cases, at such times other than at the stated sessions scheduled therefor as may be required by the exigencies of the situation and the engagements of the court; *provided that at least fourteen days' notice thereof shall be given to all parties of their counsel of record unless such notice be waived in writing.* (Emphasis added.)

It is clear that under the circumstances of this case, where time was of the essence, that the Chancellor could ignore the rule. Pa. R.C.P. No. 248 reads: "The time prescribed by any rule of civil procedure for the doing of any act may be extended or shortened by written agreement of the parties or by order of the Court." No local rule may be inconsistent with this rule. *See* Pa. R.C.P. No. 239(b). Under the circumstances, the Chancellor did not abuse his discretion by scheduling the trial for August 7, 1984.

---

[30] The Chancellor ruled that because Rule *257 was never called to his attention at or prior to the trial, this issue has been waived. However, it is clear from the record that counsel for Bensalem formally raised the rule in his petition for continuance which was presented to the Chancellor before testimony began.

Appellants aver that the Chancellor erred in requiring that examination of all witnesses on behalf of the Appellants be conducted by only one attorney.

Pa. R.C.P. No. 223[31] states in pertinent part:

(a) Subject to the requirements of due process of law and of the constitutional rights of the parties, the court may make and enforce rules and orders covering any of the following matters, *inter alia:*

. . . .

(2) Limiting the number of attorneys representing the same party or the same group of parties, who may actively participate in the trial of the case or may examine or cross-examine a witness or witnesses[.]

Appellants argue that they were severely prejudiced by the Chancellor's ruling that only one attorney for the collective plaintiffs would be permitted to examine and cross-examine witnesses. They claim that because the time for discovery was limited, counsel for Appellants found it necessary to split the burden of the work with each of the three attorneys becoming well-versed in only a portion of the entire litigation.

We find that despite Appellants' averments, the Chancellor did not abuse his discretion. Pa. R.C.P. No. 223 specifically gives the chancellor the power to limit the number of attorneys who may participate in the trial. In this case, where there were a total of six attorneys involved, it is obvious that the Chancellor was free to establish ground rules which would permit the trial to proceed smoothly. Further, all three plaintiffs in the case, Northampton, Bensalem and Middletown, had

---

[31] This rule is entitled "Conduct of the Jury Trial" but we believe that it applies, nevertheless, to a non-jury equity trial. The official note to Pa. R.C.P. 1501 states that Rules 201 to 250 apply to all actions in equity.

identical interests and were challenging the contract on the same grounds. Indeed, if it weren't for the intervention of Bensalem and Middletown, counsel for Northampton would have been required to shoulder the entire burden of the trial himself.

Appellant Bensalem raises two additional procedural issues. First, it claims that the Chancellor erred by precluding Bensalem from participating in the pre-trial conference. At the time of the pre-trial conference, Bensalem had not yet intervened in the action. It is true that it was agreed at the pre-trial conference that Bensalem, along with three other parties, could intervene. However, that does not alter the fact that at the time the pre-trial conference was commenced Bensalem was not a party. We will not hold that the Chancellor abused his discretion in not permitting Bensalem to participate.

Second, Bensalem argues that the Chancellor erred in scheduling argument for all post-trial motions for September 5, 1984 and requiring all briefs to be submitted on or before that date. Bensalem, not suprisingly, cites no authority for this proposition. We note that the trial ended on August 10, 1984 and that the complete notes of testimony were transcribed by August 23, 1984. Counsel for Bensalem had nearly two weeks from the time a full transcript was available to the time briefs were due. All parties were laboring under the same time constraints. Certainly, any member of the bar should be capable of preparing a brief on nearly any conceivable subject in two weeks. The Chancellor did not abuse his discretion in scheduling September 5, 1984 as the day briefs were due and argument would be heard on post-trial motions.

*Conclusion*

After considering all of the bases for error raised by Appellants, we find that the Chancellor did not abuse his discretion. His final decree must be affirmed.

ORDER

The Bucks County Common Pleas Court order dated October 19, 1984, No. 84-5036-12-5, dismissing Appellants' exceptions to the adjudication and decree nisi dated August 10, 1984 and entering said decree as a final decree is affirmed.