**DIAMOND ENERGY, INC., Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 23, 1994.

Decided Jan. 13, 1995.

---

Lynn N. Hargis, for petitioner.

Terrence J. Buda, Asst. Counsel, for respondent.

W. Edwin Ogden, for intervenor, Metropolitan Edison Co.

Before DOYLE and FRIEDMAN, JJ., and KELTON, Senior Judge.

KELTON, Senior Judge.

Diamond Energy, Inc. (Diamond), a producer of coal-fueled electric energy, petitions for review of the Pennsylvania Public Utility Commission's (PUC's) February 25, 1994 order approving Metropolitan–Edison Company's (Met–Ed's) application to begin construction of a 152–megawatt combustion turbine electric generating unit fueled by natural gas. The PUC also denied Diamond's request for an evidentiary hearing and its motion to compel discovery.[1] We affirm.[2]

Section 519 of the Public Utility Code (Code), 66 Pa.C.S. § 519, provides as follows:

(a) **General Rule.**—Only upon the application of a public utility and the approval of the application by the commission shall it be lawful for the utility to begin the construction of an electric generating unit fueled by oil or natural gas.

(b) **Review by commission.**—Every application shall be made to the commission, in writing, and shall be in the form and contain the information the commission requires by its regulations. *The commission shall approve an application if, after reasonable notice and hearing, the affected public utility proves, and the commission finds, any of the following:*

*(1) There are no reasonably available sites on which a unit or units of comparable capacity fueled by coal, a synthetic derived in whole or in part from coal or a mixture which includes coal or is derived in whole or in part from coal could be operated in compliance with present and reasonably anticipated environmental laws and regulations.*

*(2) There is a strong probability that construction and subsequent operation of a unit or units of comparable capacity fueled by coal, a synthetic derived in whole or in part from coal or a mixture which includes coal or is derived in whole or in part from coal would be more costly to ratepayers over the useful life of the nonoil or nongas unit or units than would construction and subsequent operation of the unit proposed by the utility.*

. . . .

(d) **Time limit on commission review.**—If the commission fails to approve or disapprove an application within six months after the date on which the application is filed, it shall be lawful for the affected utility to construct the proposed electric generating unit as though the commission had approved the application.

66 Pa.C.S. § 519(a), (b) and (d) (emphasis added).

## PROCEDURAL BACKGROUND

On August 11, 1993, Met–Ed filed an application requesting approval to begin construc-

---

1. This Court's scope of review from final orders of the PUC is limited to determining whether constitutional rights have been violated, an error of law committed or whether the Commission's findings and conclusions are supported by substantial evidence. *West Penn Power Company v. Pennsylvania Public Utility Commission,* 134 Pa.Commonwealth Ct. 53, 578 A.2d 75 (1990), *petition for allowance of appeal denied,* 527 Pa. 660, 593 A.2d 429 (1991).

2. Met–Ed is an intervenor in this case. The Pennsylvania Coal Association and MidAtlantic Cogen, Inc. filed amicus curiae briefs.

tion of a 152–megawatt combustion turbine electric generating plant fueled by natural gas at its Portland Generation Station site in Upper Mount Bethel Township, Northampton County (the Portland Project).

On September 16, 1993, Diamond filed a petition to intervene, protest to the application, and petition for an order directing Met–Ed to purchase equivalent capacity from Diamond's coal-fueled electric generating unit project (the Clearfield Project). (R.R. 34–40a.) Therein, Diamond alleged, *inter alia,* that the Clearfield Project (1) is a reasonably available site for a unit which complies with environmental laws and regulations as required under Section 519(b)(1); (2) will over its life be more cost-effective to ratepayers than Met–Ed's proposed gas-fueled unit as required under Section 519(b)(2); and (3) should be given preference as one of the three finalists chosen by Met–Ed to be in the preliminary selection group of its competitive procurement program.

On October 12, 1993, Met–Ed filed an answer opposing Diamond's petition to intervene, asserting that (1) Met–Ed's competitive procurement program was never designed to procure capacity other than that approved by the PUC in its December 12, 1991 order[3] and that it was not precluded from privately negotiating for peaking capacity; (2) the Clearfield Project would not constitute capacity comparable to the Portland Project since the latter would supply peaking capacity and the former would supply baseload capacity unsuited for peaking requirements;[4] (3) the Clearfield Project would be too distant to contribute to localized eastern Pennsylvania grid voltage regulation because Diamond would have to construct miles of high voltage transmission line facilities in order to connect to Met–Ed's transmission grid; and (4) the Portland Project was more cost-effective than the Clearfield Project.

On October 28, 1993, Diamond filed a response and request for a hearing, contending that Met–Ed failed to rebut Diamond's contention that the Clearfield Project was a reasonably available site for a unit of comparable capacity fueled by coal which could be operated in compliance with environmental laws and regulations. Diamond further contended that Met–Ed's factual claims that its project was more cost effective were based on disputed assumptions requiring a hearing.

On November 19, 1993, Met–Ed filed a reply to Diamond's request for a hearing, arguing that the latter's request was premature as it had not yet established standing to participate in the application proceeding. Met–Ed also asserted that an adverse decision by the PUC on its application could not be used to compel it to accept the Clearfield project and that competitive bidding and approval of the Clearfield Project were outside of the scope of a Section 519 proceeding. On November 30, 1993, Diamond responded to Met–Ed's reply and asserted that a hearing was necessary to resolve factual disputes over cost questions.

On December 3, 1993, PUC Secretary John G. Alford issued a secretarial letter, *inter alia,* stating why an oral hearing was unnecessary:

> In the Commission's judgment, the resolution of these economic and technical issues is not likely to turn on witness credibility. Therefore, we will not schedule any oral proceedings before an ALJ [adminis-

---

3. The PUC in a December 12, 1991 order at Docket No. P–890366 adopted a joint petition for settlement wherein the parties agreed on a pilot basis to include independent power producers in the procurement of capacity from qualifying facilities. (PUC's February 25, 1994 Opinion and Order at 4, n. 4.)

4. The quantity of capacity needed is determined by user demand or the rate at which the energy is delivered. Utilities categorize plants based on the cost of demand as follows: a) baseload power—the minimum demand and the least expensive to operate; b) intermediate power—more demand and more expensive to operate than baseload; and c) peaking power—the highest demand and the most expensive to operate.
*Pennsylvania Electric Company v. Pennsylvania Public Utility Commission,* 166 Pa.Commonwealth Ct. 413, ——, 648 A.2d 63, 76–77 (1994) (citation omitted).

trative law judge]. Nevertheless, in order to develop an agency record in this proceeding it will be necessary to set a briefing schedule which also provides for the submission of supporting affidavits.

(R.R. 89a.) Also in the letter, he directed the parties to address the following questions: the standards to be satisfied by an application in a Section 519 proceeding; standing; the appropriate definition of "comparable capacity;" a comparison of gas-powered units and coal-powered units; and the cost and ability of both units to meet all environmental requirements.

By letter dated December 17, 1993, Diamond requested that Met–Ed provide certain information regarding the latter's system and the Portland Project. Met–Ed objected to that request and as a result, Diamond filed a motion to compel discovery on January 4, 1994. Met–Ed filed a response to that motion on January 10, 1994. In its February 25, 1994 opinion and order, the PUC approved Met–Ed's application and denied Diamond's motion to compel discovery, holding that Diamond failed to file the motion in a timely manner, given the six-month time frame in which the proceeding must be completed. (PUC's Opinion and Order at 12, n. 9.)

When the PUC failed to act on Diamond's March 7, 1994 petition for rehearing (Appendix to Diamond's Reply Brief), Diamond filed a timely appeal with this Court.

## ISSUES

There are three issues before us for review: (1) whether the PUC erred in finding that the site for Diamond's Clearfield Project, a proposed unit of allegedly comparable capacity fueled by coal or a mixture including coal, was not a reasonably available site of comparable capacity under Section 519(b)(1); 2) whether the PUC erred in determining that, under Section 519(b)(2), there is a strong probability that the construction and subsequent operation of Diamond's Clearfield Project would be more costly to Met–Ed's ratepayers over its useful life than the construction and subsequent operation of Met–Ed's Portland Project; and 3) whether the procedures used by the PUC were sufficient to satisfy Section 519's requirement that the PUC provide "reasonable notice and hearing" when considering Met–Ed's application for an electric generating unit fueled by oil or natural gas.

## DISCUSSION

### I. Reasonable Availability of Site for the Clearfield Project:

Under Section 519(b), a utility seeking approval of its application to construct an electric generating unit fueled by oil or natural gas must satisfy either (b)(1) or (b)(2). We first consider Section 519(b)(1):

(1) *There are no reasonably available sites on which a unit or units of comparable capacity fueled by coal,* a synthetic derived in whole or in part from coal or a mixture which includes coal or is derived in whole or in part from coal *could be operated in compliance with present and reasonably anticipated environmental laws and regulations.*

66 Pa.C.S. § 519(b)(1) (emphasis added).

The PUC concluded that Met–Ed proved that there was no reasonably available site on which a unit of comparable capacity fueled by coal could be operated in compliance with the law, in part, because "in determining 'comparable capacity,' consideration must be given to more than merely the size of proposed projects. By focusing solely on the size of a project, this Commission would effectively dismiss all other aspects of 'capacity' as irrelevant. We will not work in such a vacuum." (PUC Opinion at 17–18.) Thus, the PUC determined that it also must consider whether a facility will offer a comparable type of capacity, e.g. baseload or peaking. "If a unit with quick start capabilities is what is needed on a system, a unit which requires half a day to reach its full output will not be considered 'comparable.'" (PUC Opinion at 18.)

The gas-powered Portland project has a start-up time of ten minutes. (PUC Opinion

at 9.) The PUC noted that it was an "unlikely scenario" to operate a base load coal-fired generating facility as a peaking unit, one of the main reasons being a longer start-up time for coal-powered units. (*See* PUC Opinion at 23–24.) Also, the PUC stated that it is undisputed that a comparable coal-fired peaking unit is not commercially available and that Met–Ed needs the Portland Project for *peaking* capacity. (PUC Opinion at 21.)

With regard to a site being reasonably available, the PUC found that "[s]o long as Diamond Energy can interconnect to a system which can deliver power to Met–Ed, the site will be considered available." (PUC Opinion at 27.) It further found, however, that the Clearfield Project site was not *reasonably* available because "Diamond cannot guarantee it will be able to secure the necessary property to construct a transmission line" necessary to deliver power to Met–Ed. (PUC Opinion at 27–28.) Diamond conceded at oral argument before this Court on September 23, 1994 that it had no powers of eminent domain.

■ Diamond argues that the PUC erred in concluding that the site for the Clearfield Project was not reasonably available because the PUC found that Diamond had a site available to construct a generating unit. Diamond concedes that the PUC found that a site was available only so long as Diamond could interconnect to a system which could deliver power to Met–Ed, but contends that the site only had to be reasonably available under Section 519, *not* guaranteed.

The PUC argues that there is substantial evidence to support the finding of "not reasonably available" because Section 519 cannot be applied in a vacuum. A site for a coal-fueled unit is only reasonably available *if* it can be connected. Thus, although the PUC concedes that reasonably available does not mean guaranteed, it argues that substantial evidence for the finding of "not reasonably available" is found in the fact that Diamond does not own or have a purchase op-

tion for a connection corridor for the miles of transmission lines necessary to connect Penelec's system with the site.

Given the PUC's expertise and the absence of an abuse of discretion, we decline to disturb its interpretation of what constitutes a reasonably available site of comparable capacity. *Norfolk and Western Railway Company v. Pennsylvania Public Utility Commission,* 489 Pa. 109, 413 A.2d 1037 (1980).

## II. Strong Probability:

■ Under Section 519(b)(2), a utility seeking approval of its application to construct an electric generating unit fueled by oil or natural gas, alternatively, must prove the following:

(2) *There is a strong probability that construction and subsequent operation of a unit or units of comparable capacity fueled by coal, a synthetic derived in whole or in part from coal or a mixture which includes coal or is derived in whole or in part from coal would be more costly to ratepayers over the useful life of the nonoil or nongas unit or units than would construction and subsequent operation of the unit proposed by the utility.*

66 Pa.C.S. § 519(b)(2) (emphasis added).

With regard to there being a strong probability that Diamond's Clearfield Project would be more costly to Met–Ed's ratepayers over its useful life than would Met–Ed's Portland Project, the PUC accepted Met–Ed's analysis that "the construction and intended operation of the Portland CT [combustion turbine] will be less costly to ratepayers than the surrogate coal-fired Clearfield Project." (PUC Opinion at 24.) As for the applicable capacity factor, Diamond argued that 86.6 percent was proper and Met–Ed contended that 15 percent was correct.[5] The PUC chose to accept Met–Ed's 15 percent, stating as follows:

[G]iven the assumption that Met–Ed needs additional peaking capacity, and given the undisputed fact that a comparable coal-

5. The parties were not really disputing the fig- ures themselves, only their application.

fired *peaking* unit is not commercially available, [R.R. 253a] we are compelled to accept Met–Ed's assumed capacity factor of 15 percent for *both* the proposed Portland CT and the Clearfield project in order to make a determination pursuant to Section 519.

(PUC Opinion at 21) (emphasis in original).

Specifically, the PUC determined that what is relevant in analyzing "comparable capacities" is a comparison between the rates of the gas-fired Portland Project and those of the coal-fired Clearfield Project *at peak load times.* Diamond admitted that "the Clearfield plant would be run in a baseload mode." (R.R. 259a.) Also, Diamond failed to submit evidence as to its coal-fired unit's comparable peak-rate cost. Met–Ed, on the other hand, did present evidence comparing the coal-fueled unit's peak-rate cost with the gas-fueled unit's peak-rate cost (R.R. 168–173a, 175a) and the PUC accepted the same. (PUC Opinion at 20–21.)

Specifically, the PUC accepted the affidavit of Met–Ed's Mr. Richard A. D'Angelo:

> According to Mr. D'Angelo's detailed analysis, the total revenue requirements for the Portland CT will be about $477 million, or $213 million on a net present value (NPV) basis. For comparison, Diamond Energy's Clearfield Project and related costs obtained by Met–Ed in its CPP [competitive procurement program] were used. The total revenue requirements for the Clearfield Project, assuming a 15 percent capacity factor, will be $1,365 million, or $616 million (NPV). This revenue requirement is nearly three times that of the Portland CT (Appendix B, at pages 2 and 4) [R.R. 169a, 171a].

Mr. D'Angelo's analysis includes additional start up charges of approximately $53 million (NPV) to reflect the operation of the Clearfield Project in a peaking mode. No start up charges were included for the Portland CT since combustion turbines are designed for rapid start up and intermittent operation. The small amount of additional fuel which is consumed during start up was incorporated in the average heat rate (Appendix B, at page 5) [R.R. 172a].

(PUC Opinion at 22.)

■ The purpose of Section 519 is to promote coal-fired units. If coal technology has not yet reached the level where it may reasonably be used for peaking facilities, however, that does not mean that a coal-fired unit will never be "comparable" and that the statute is rendered meaningless. For example, there may be a case where a gas applicant seeking to construct a baseload facility would be unable to prove that there is not a comparable coal-fired facility under Section 519. As the PUC noted in its decision:

> [O]ne cannot make the leap that because coal plants operate differently than gas-fired plants there can never be an available coal plant of comparable capacity. A coal plant of comparable size which would meet the stated capacity need in a comparable fashion would be deemed to be 'comparable capacity.'

(PUC Opinion at 18.)

Accordingly, we conclude that the PUC, in its discretion, did not err in finding that, because peak load is necessary, there is a strong probability that the Clearfield Project is not a comparable facility and would cost the ratepayers more over the unit's useful life. *Norfolk and Western Railway Company v. Pennsylvania Public Utility Commission,* 489 Pa. 109, 413 A.2d 1037 (1980).

## III. Sufficiency of PUC's Procedures:

### A. Question of Law:

■ Diamond argues that the PUC erroneously failed to hold an oral hearing, to allow discovery and to provide the parties an opportunity to confront and cross-examine adverse witnesses in compliance with Section 519(b)'s "reasonable notice and hearing" requirement. Although we later consider whether Diamond actually waived its right to an oral hearing, we will address on the merits the sufficiency of the "paper" hearing.

The PUC argues that Section 519 itself does not specifically require an *oral* hearing. (As noted above, the statute requires "reasonable notice and hearing.") Further it argues that, given the six-month time limitation in which the PUC must act on an application and the fact that a question of law is at issue (the definition of "comparable capacity"), it was not unreasonable for the Secretary to direct that affidavits be submitted and to determine that it was unnecessary to schedule oral proceedings before an ALJ.

In its opinion, the PUC stated as follows:

Here, the issues involve the availability of sites for coal-fired units, environmental laws and regulations, and cost comparisons of coal-fired units versus gas-fired units of comparable capacity. As stated previously, it is unlikely that the Commission's decision on these issues will turn on the credibility of the testimonial affidavits. Rather, *our decision will turn on the definition we give to the term 'comparable capacity'* in the statute, compliance with environmental laws and regulations, and statistical accuracy of the cost projections.

(PUC's February 25, 1994 Opinion at 10–11) (emphasis added).

In *Pennsylvania Coal Mining Association v. Insurance Department*, 471 Pa. 437, 370 A.2d 685 (1977), our Supreme Court determined that coal mining companies required to purchase black lung insurance must be provided with reasonable notice of proposed rates and an opportunity to present written objections before the rates were approved by the Insurance Commissioner or deemed into effect. The Court reasoned that it could not "conclude that the Association's interest is not within the protections of the due process clause simply because the Pennsylvania Workmen's Compensation Act, and the Insurance Company Law of 1921 do not expressly create any entitlement in the Association to rates it must pay for insurance." *Id.* at 447, 370 A.2d at 690 (footnotes omitted).

With regard to the necessity for oral hearings, the *Pennsylvania Coal* Court stated as follows:

We do not believe, however, that due process requires that the Association receive a full hearing before rates can become effective. While oral proceedings may be necessary for determinations likely to turn on witness credibility, written submissions may be adequate when economic or statistical questions are at issue.

*Id.* at 453, 370 A.2d at 693 (footnote omitted) (citations omitted).

In *Lehigh Valley Power Committee v. Pennsylvania Public Utility Commission*, 128 Pa.Commonwealth Ct. 259, 563 A.2d 548 (1989), the power committee filed a petition for review of a PUC order dismissing its complaint filed in opposition to an energy cost rate filing of the state power and light company. We concluded that, because the power committee had the opportunity to present its argument via filing an answer to the petition on the legal issue of whether utility payments for energy purchased from qualified facilities were automatically recoverable through the energy cost rate mechanism, due process was satisfied. In response to the argument that the power committee's due process rights were violated by the PUC's dismissal of the complaint without a hearing, we held that "[i]t is a fundamental proposition of law that a hearing or trial procedure is necessary only to resolve disputed questions of fact and is not required to decide questions of law, policy or discretion." *Id.* at 275, 563 A.2d at 556.

The fundamental tenet that hearings are only necessary to resolve disputed issues of fact is also manifested in summary judgment proceedings. In that context, a summary judgment motion is only granted where there is no issue to be presented to the jury. Pa.R.C.P. No. 1035(b). Thus, the constitutional right to a jury is protected in summary judgment proceedings because the motion will be granted only where there are no disputed issues of fact.

Based on the lack of specific language in the statute mandating an oral hearing, applicable caselaw and the absence of disputed facts, we conclude that the "paper" hearing here was not violative of due process.

## B. No Property Interest:

With regard to any potential property interest of Diamond, the PUC concluded as follows:

Our disposition of Met–Ed's application cannot provide any affirmative relief to Diamond by way of an order approving their Clearfield Project. Moreover, there is no potential deprivation to Diamond that can occur as a result of our decision. *Matthews* [*Mathews*] *v. Eldrige*, 424 U.S. 319, 96 S.Ct 893 [47 L.Ed.2d 18] (1976). Our decision does not involve substantial property rights for Diamond Energy. *Conestoga National Bank of Lancaster v. Patterson*, 442 Pa. 289, 275 A.2d 6 (1971).

(PUC Opinion at 11.)

 The PUC argues that it was not error to determine that Diamond does not have a property interest protected by the Fourteenth Amendment to the United States Constitution in the development of a competing coal-fueled generating unit or a legitimate claim of entitlement in selling power to Met–Ed. It points out that the legislative intent of Section 519 was to promote the coal industry, not to promote independent power producers. It too cites *Conestoga National Bank of Lancaster v. Patterson*, 442 Pa. 289, 275 A.2d 6 (1971) in support of the proposition that Diamond has no property rights.

*Conestoga* involved the appeal of banks in a particular town from the Department of Banking's granting of an applicant bank's application for a letter of authority to establish a branch bank in the same town. The protesting banks alleged that they were deprived due process of law by the Department's refusal to permit either a hearing on the branch bank application or, at the minimum, access to the contents of the application and other supporting data on file with the Department.

With regard to substantial property rights, our Supreme Court determined as follows:

[I]t is clear beyond question that substantial property rights are involved in the Banking Department's adjudication here. Those rights include not only the rights of the applicant and the protesting banks but also the rights of the surrounding financial community. . . .

[T]he banking system is unique in that failure of one of several competing institutions frequently leads not to the enhancement of the relative position of the surviving competitors but to possible adverse effects to all.

*Conestoga*, 442 Pa. at 298, 275 A.2d at 11.

The Court thus held that, because substantial property interests were involved, the protesting banks had to be afforded notice, hearing, an opportunity to present evidence and access to the application and supporting data when confronted with a proposal for a new branch bank. Specifically, the Court stated as follows:

Procedural due process does not require notice and a hearing in every conceivable situation involving administrative action. *E.g.*, [*Cafeteria and Restaurant Workers Union, Local 473, AFL–CIO v. McElroy*, 367 U.S. 886 [81 S.Ct. 1743, 6 L.Ed.2d 1230] (1961) ]. However, these procedural safeguards should accompany a situation where the administrative action is adjudicatory in nature and involves substantial property rights.

*Conestoga*, 442 Pa. at 296, 275 A.2d at 9 (citation omitted).

In *Barasch v. Pennsylvania Public Utility Commission*, 119 Pa.Commonwealth Ct. 81, 546 A.2d 1296 (1988), *rehearing denied in part*, 119 Pa.Commonwealth Ct. 81, 550 A.2d 257 (1988), *petition for allowance of appeal denied*, 523 Pa. 652, 567 A.2d 655 (1989), we considered the appeals by industrial ratepayers and the Office of Consumer Advocate from an order of the PUC approving a contract for the purchase of electric power and capacity of a 43–megawatt generating unit by the West Penn Power Company from the Milesburg Energy, Inc. In its order, the PUC declared that the terms of the contract between West Penn and Milesburg Energy,

Inc. are in the public interest and that the utility may recover from its customers payments made under the contract. On appeal, we held that, because substantial property rights of West Penn customers were involved, they must be afforded due process regarding the PUC's approval of a contract for the purchase of electric power and capacity of a 43–megawatt generating unit by the West Penn Power Company from the Milesburg Energy, Inc.

Here, however, unlike the protesting banks and the West Penn power customers, Diamond has no substantial property interest that would be affected by the PUC's disposition of Met–Ed's application. For example, unlike the protesting banks, Diamond is not located in Met–Ed's service area and thus, does not have even the "competitor" status discussed by the *Conestoga* court. Further, unlike the West Penn power customers, Diamond is not an affected Met–Ed customer. Accordingly, we conclude that the PUC afforded Diamond an adequate "hearing" and that there is simply no substantial property interest here warranting an oral hearing.

### C. Discovery Motion:

■ The PUC denied Diamond's motion to compel discovery holding that, given the six-month time frame in which the proceeding must be completed under Section 519(d), Diamond failed to file its motion in a timely manner. It stated that Diamond should have commenced discovery around the time it filed its September 16, 1993 petition to intervene. Diamond initially requested information from Met–Ed on December 17, 1993. It filed a motion to compel discovery on January 4, 1994.

Two PUC regulations are applicable here. Under 52 Pa.Code § 5.321(a), the presiding officer over formal PUC proceedings has discretion to "vary provisions of this subchapter [Chapter 5] as justice requires." 52 Pa.Code § 5.331(b), also included in Chapter 5 of the PUC regulations, provides as follows:

(b) *A participant shall endeavor to initiate discovery as early in the proceedings as reasonably possible.* In a proceeding, the right to discovery commences when a complaint, protest or other adverse pleading is filed or when the Commission institutes an investigation or on the record proceeding, whichever is earlier.

52 Pa.Code § 5.331(b) (emphasis added).

Given our limited scope of review of a decision of the PUC and the implicit discretion of the presiding officer to interpret the phrase "reasonably possible," we cannot conclude that it erred in denying Diamond's motion to compel discovery as untimely.

### D. Waiver of Request for Oral Hearing:

■ The PUC further argues that Diamond waived its right to an oral hearing. It contends that Diamond should not be permitted to remain silent, participate fully in the proceedings and only complain of a procedural inadequacy *after* entry of a final order in its opponent's favor.

Diamond requested a hearing on October 28, 1993 in its Response to Met–Ed's October 12, 1993 Answer Opposing Diamond's Petitions and Protest. (R.R. 65–72a.) Diamond again raised its request for a hearing in its November 30, 1993 Response to Met–Ed's Reply. (R.R. 85–6a.) In its December 15, 1993 letter to the Secretary requesting an extension of time for the submission of briefs and testimonial affidavits; however, Diamond failed to object to the lack of oral hearings. (R.R. 91a.) In fact, Diamond made the following statement in that letter:

Diamond believes that this brief extension of dates at these initial stages will ultimately save the Commission's time by providing a more complete and, therefore, more useful record on which the Commission can base its decision herein.

(R.R. 92a.) Nowhere in that letter did Diamond even mention an oral hearing or protest the submission of testimonial affidavits.

In addition to failing to preserve its request for a hearing in its letter, Diamond never petitioned to reopen the proceeding for the purpose of taking additional evidence

**1370** ■

prior to the PUC's final decision. 52 Pa. Code § 571. If it believed that the evidence submitted was inadequate for some reason, it could have petitioned to complete the record. Obviously, Diamond hoped that the evidence submitted would be sufficient for the PUC to find in its favor.

Based on Diamond's failure to preserve its request for an oral hearing, we must conclude that there was a waiver. *Octoraro Railway, Inc. v. Pennsylvania Public Utility Commission,* 85 Pa.Commonwealth Ct. 283, 482 A.2d 278 (1984).

## CONCLUSION

For the above reasons, we affirm the decision of the Pennsylvania Public Utility Commission approving Metropolitan Edison's application to begin construction of a 152–megawatt combustion turbine electric generating unit fueled by natural gas.

## *ORDER*

**AND NOW,** this 13th day of January, 1995, the order of the Pennsylvania Public Utility Commission dated February 25, 1994 is hereby affirmed.

FRIEDMAN, Judge, dissenting.

I respectfully dissent. I believe that the Pennsylvania Public Utility Commission's

(PUC) denial of Diamond Energy Inc.'s (Diamond) request for an oral hearing prior to PUC action on Metropolitan Edison Company's (Met–Ed) application deprived Diamond of its procedural due process rights.[1] Accordingly, I would vacate the PUC's approval of Met–Ed's application and remand this case for a proper hearing.

The Majority has reached a contrary result because it concludes that (1) the plain language of the statute does not mandate an oral hearing, and (2) case law allows a paper hearing where there are no disputed facts which, the Majority asserts, is the situation here.[2] (Majority Op. at 1367.) I believe that the Majority's conclusions are erroneous.

### I.

First, the plain language of section 519(b) of the Public Utility Code (Code), *as amended,* 66 Pa.C.S. § 519(b), *does* require an oral hearing. The statute mandates that the PUC approve or disapprove an application for the construction of an electric generating unit fueled by natural gas after a "hearing." Section 1903 of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1903, states that

> Words and phrases shall be construed . . . according to their common and approved usage; but technical words and phrases

1. Med–Ed applied for permission to construct an electric generating unit fueled by natural gas pursuant to section 519 of the Public Utility Code (Code), *as amended,* 66 Pa.C.S. § 519 (emphasis added), which states that the PUC shall approve an application for the construction of an electric generating unit fueled by natural gas

> (b) .... if, *after* reasonable notice and *hearing,* the affected public utility proves, and the commission finds, any of the following:
> (1) There are no reasonably available sites on which a unit . . . of comparable capacity fueled by coal . . . could be operated in compliance with present and reasonably anticipated environmental laws and regulations.
> (2) There is a strong probability that construction and subsequent operation of a unit . . . of comparable capacity fueled by coal . . . would be more costly to ratepayers over the useful life of the . . . nongas unit . . . than would construction and subsequent operation of the unit proposed by the utility.

2. The Majority also maintains that there are no substantial property rights at stake here. (Majority Op. at 1369.) I disagree.

It is well accepted that a substantive property interest may be created by a statute. *See Sasko v. Charleroi Area School District,* 121 Pa.Commonwealth Ct. 220, 550 A.2d 296 (1988). Here, the Majority acknowledges that the legislative intent of section 519 is to promote the coal industry. (Majority Op. at 1368.) However, the Majority fails to recognize that section 519 of the Code confers upon Diamond a substantial property right in its coal-fired generating unit.

Indeed, Diamond's coal-fired unit is within the legislative contemplation of section 519. If the legislature intended that section 519 apply only to base-load situations, and *not* where peaking capacity is involved, the legislature could have excluded peak-load situations from the requirements of section 519. It is obvious that the legislature did not exempt peaking activity from the mandate of section 519. Yet, the PUC's actions here have done just that.

and such others as have acquired a peculiar and appropriate meaning ... shall be construed according to such peculiar and appropriate meaning or definition.

A "hearing" is a

[p]roceeding of relative formality (though generally less formal than a trial), generally public, with definite issues of fact or of law to be tried, in which witnesses are *heard* and parties proceeded against have right to be *heard,* and is much the same as a trial and may terminate in final order. It is frequently used in a broader and more popular significance to describe whatever takes place ... before administrative agencies as conducted by a hearing examiner or Administrative Law Judge.

Black's Law Dictionary 649 (5th ed. 1979) (emphasis added). Thus, properly construed, the plain language of the statute requires an *oral* hearing.

Moreover, PUC regulations governing the procedure here, ignored by the Majority, require an oral hearing.[3] *See* 52 Pa.Code §§ 5.1–5.633 (pertaining to "Formal Proceedings"). These regulations state that formal "[h]earings will be held upon the filing of the [petition to intervene], unless waived by the parties." 52 Pa.Code § 5.201. Clearly, Diamond did not waive its right to a hearing; quite the contrary, Diamond twice specifically requested an oral hearing.[4] (R.R. at 65a–72a; 85a–86a.)

The PUC admitted that it failed to comply with applicable regulations when it denied Diamond's request for a hearing: "To the extent that our procedure in this matter is inconsistent with the Commission's rules and regulations, the applicable rules and regulations are deemed waived as provided for in 52 Pa.Code § 5.43." (R.R. at 89a–90a.) Section 5.43 states:

(a) A petition to the Commission for ·the ... waiver ... of a regulation shall set forth clearly and concisely the interest of the petitioner in the subject matter, the specific ... waiver ... requested, and shall cite by appropriate reference the statutory provision or other authority involved. The petition shall set forth the purpose of, and the facts claimed to constitute the grounds requiring the ... waiver....

52 Pa.Code § 5.43. However, no one complied with these provisions here. No one filed a petition containing a statement of the interest of the petitioner, the specific waiver requested, the authority, the purpose and the grounds for the waiver. The PUC apparently believes that, in spite of the clear language of the regulation, section 5.43 empowers it to deem waived any procedural right conferred upon the regulated community by these regulations. If that is true, then every regulation is meaningless, and the regulated com-

---

**3.** Met–Ed filed its original application pursuant to PUC regulations at 52 Pa.Code §§ 5.11–5.14. (R.R. at 5a.) Diamond then filed its petition to intervene under 52 Pa.Code § 5.71. (R.R. at 34a.) Met–Ed followed with its answer to Diamond's petition pursuant to 52 Pa.Code § 5.61. (R.R. at 50a.) Then, after Diamond requested a hearing, Met–Ed responded pursuant to 52 Pa. Code § 5.63. (R.R. at 75a.)

**4.** The Majority concludes that Diamond waived its right to an oral hearing because Diamond failed to object to the lack of oral hearings in its December 15, 1993 letter to the Secretary. (Majority Op. at 1369.) In support thereof, the Majority cites *Octoraro Railway, Inc. v. Pennsylvania Public Utility Commission,* 85 Pa.Commonwealth Ct. 283, 482 A.2d 278 (1984), which is not applicable here.

In *Octoraro,* this court cited Pa.R.A.P. 1551(a) for the proposition that an argument raised for the first time in a petitioner's brief is waived. I

fail to see any connection between *Octoraro* and the present case, where Diamond twice specifically requested an oral hearing. In Diamond's Response and Request for Hearing, Diamond stated:

[Diamond] hereby ... requests that an evidentiary hearing be held in the above docketed proceeding because the Answer clearly demonstrates that there are numerous disputed questions of fact material to the Commission's consideration....

(R.R. at 65a.) Subsequently, in the Response of Diamond Energy, Inc. to Metropolitan Edison Reply, Diamond stated:

For the reasons set out above and in its previous pleadings in this docket, Diamond believes that it has raised disputed questions of material fact that must be resolved by a hearing in order for the Commission to make either of the findings required to approve Met–Ed's application herein.

(R.R. at 85a–86a.)

munity is at the mercy of the PUC. Indeed, such is the position of Diamond here.[5]

## II.

Second, contrary to the view espoused by the Majority, case law demonstrates that Diamond was entitled to an oral hearing before the PUC ruled on Met–Ed's application. The Majority relies upon *Pennsylvania Coal Mining Association v. Insurance Department,* 471 Pa. 437, 370 A.2d 685 (1977), for the proposition that a paper hearing provides adequate due process where there are no disputed facts. However, *Pennsylvania Coal* does not stand for that proposition at all; in fact, a proper application of the actual holding in *Pennsylvania Coal* shows that Diamond is entitled to an oral hearing.

In *Pennsylvania Coal,* a coal mining association challenged the procedure for establishing insurance rates for black lung disease. The procedure in question provided that a private insurance group propose the rates; the rates would be deemed approved if the Commissioner took no action; and, after the rates took effect, interested parties had the right to a full hearing. Our Supreme Court initially determined that a hearing was necessary because of the deemed approval. However, the Court further decided that a paper hearing was sufficient because (1) the determination was not likely to turn on witness credibility (only economic or statistical questions were at issue) *and* (2) interested parties had the right to a full hearing after the rates took effect.[6]

5. The regulations also provide Diamond with the right to conduct discovery. However, the PUC denied Diamond's motion to compel discovery because Diamond did not "initiate discovery as early in the proceedings as reasonably possible." (R.R. at 341a, n. 9.) The Majority affirmed the denial. (Majority Op. at 1369.) I disagree.

Diamond filed its petition to intervene on September 16, 1993 and filed its request for a hearing on October 28, 1993. Diamond learned for the first time on December 7, 1993 that its request for a hearing was denied and that the PUC would consider only four issues in reaching its decision on Met–Ed's application. (R.R. at 88a–91a.) About one week later, on December 15, 1993, Diamond requested an extension of time to file briefs and affidavits; two days later, Diamond delivered its discovery request to Met–Ed. I believe that Diamond thus initiated discovery as early in the proceedings as reasonably possible.

6. In *Barasch v. Pennsylvania Public Utility Commission,* 119 Pa.Commonwealth Ct. 81, 102, 546 A.2d 1296, 1306 (1988), *appeal denied,* 523 Pa. 652, 567 A.2d 655 (1989) (emphasis added) (*Milesburg I* ), we summarized the holding in *Pennsylvania Coal* as follows:

In Pennsylvania Coal the Court held that notice and the opportunity to present <u>written objections</u> before proposed insurance rates were deemed into effect by virtue of the Insurance Commissioner's inaction were adequate due process protections <u>when coupled with the opportunity to challenge the rates later in a full hearing</u> before the Insurance Commissioner pursuant to section 814.

| Case | Deemed Approval | Right To Later Hearing | Due Process Required |
| --- | --- | --- | --- |
| Conestoga | No | No | Oral Hearing |
| PA Coal | Yes | Yes | Paper Hearing |
| Allegheny | No | Yes | No Hearing |
| Milesburg I | No | No | Oral Hearing |
| Diamond* | Yes | No | Oral Hearing |

In <u>Milesburg I,</u> we also examined the rationale of <u>Conestoga National Bank of Lancaster v. Patterson,</u> 442 Pa. 289, 275 A.2d 6 (1971) and <u>Allegheny Ludlum Steel Corp. v. Pennsylvania Public Utility Commission,</u> 501 Pa. 71, 459 A.2d 1218 (1983). The following chart, based on our analysis in <u>Milesburg I,</u> summarizes the amount of due process required when an administrative agency deprives a party of substantial property rights through an adjudicatory action.

*Although the Majority does not conclude that Diamond is entitled to an oral hearing, I believe otherwise based upon <u>Milesburg I.</u>

Applying *Pennsylvania Coal* to the facts here, it is first and foremost clear that Diamond is entitled to a due process hearing because inaction by the PUC results in deemed approval of Met–Ed's application.[7]

However, a paper hearing would be insufficient here because, unlike *Pennsylvania Coal,* the PUC determination turned on credibility: the PUC did not believe Diamond's contention that Met–Ed required baseload capacity but, instead, accepted Met–Ed's assertion that it needed peaking capacity. In its opinion, the PUC claimed that it was without authority under section 519 to resolve that factual issue. (*See* R.R. at 350a.) Nevertheless, the PUC, in exercising its authority under section 519 to decide whether Diamond could provide "comparable capacity," *assumed* that Met–Ed needed peaking capacity, (R.R. at 350a), an assumption that

the PUC never properly tested.[8] Inexplicably, the Majority does not even acknowledge that Diamond disputed the type of capacity that Met–Ed needed.[9]

In addition, a paper hearing would be insufficient here because, unlike *Pennsylvania Coal,* Diamond has no right to a full hearing after PUC approval of Met–Ed's application.[10] The Majority, for some unknown reason, has not even considered this factor; instead, the Majority has followed the PUC's misreading of *Pennsylvania Coal.* However, this court cannot allow an agency to distort case law to suit its own purpose; nor can this court modify the requirements set forth by our Supreme Court in *Pennsylvania Coal* for determining whether a paper hearing provides a party with sufficient due process.[11] Clearly, when all factors are considered here, this court must conclude that Diamond is entitled to an oral hearing.

7. Section 519(d) of the Code states: "If the commission fails to approve or disapprove an application within six months after the date on which the application is filed, it shall be lawful for the affected utility to construct the proposed electric generating unit as though the commission had approved the application." 66 Pa.C.S.A. § 519(d).

8. The PUC rested its entire adjudication upon that untested assumption, stating as follows:

> given the assumption that Met–Ed needs additional peaking capacity, and given the undisputed fact that a comparable coal-fired *peaking* unit is not commercially available, we are compelled to accept the Met–Ed's assumed capacity factor of 15 percent for *both* the proposed Portland CT and the Clearfield project in order to make a determination pursuant to Section 519.

(R.R. at 350a) (emphasis in original). Thus, the PUC rejected Diamond's 86.6 percent capacity factor, which is appropriate for a coal-fired baseload unit, concluded that the capital and operating costs of the coal-fired unit would be greater than those of Met–Ed's gas-fired unit, and approved Met–Ed's application.

I note also that the PUC *assumed* that Met–Ed needed peaking capacity knowing that a comparable coal-fired peaking unit was not commercially available. Thus, the PUC's interpretation of "comparable capacity" automatically precludes coal-fired units from competing with gas-fired units that provide only peaking capacity. This means that any application for construction of an oil or gas-fired generating unit can defeat section 519(b) by simply asserting that it will

provide only peaking capacity. Because the PUC claims here that it lacks authority to investigate the veracity of representations made on a section 519 application, the PUC has created a loophole that, in effect, eliminates section 519(b) provisions altogether.

9. The Majority states that Diamond did not dispute that Met–Ed needed peaking capacity. (Majority Op. at 1365.) Quite the contrary, Diamond's entire case rests upon its claim that Met–Ed requires the baseload capacity that it can provide. In support of its assertion, the Majority erroneously cites page 21 of the PUC opinion. The PUC does *not* state on page 21, or anywhere in its opinion, that Met–Ed's need for peaking capacity was undisputed; rather, the opinion states that the PUC *assumed* that Met–Ed needed peaking capacity. (*See* R.R. at 350a.)

10. In *Milesburg I,* 119 Pa.Commonwealth Ct. at 103, 546 A.2d at 1306, we stated:

> If the commission's order is affirmed by the courts, then the [approval] ... will not be subject to later challenge in a complaint proceeding before the commission under section 701; that issue will have been fully adjudicated already in these proceedings.

11. The Majority also relies upon *Lehigh Valley Power Committee v. Pennsylvania Public Utility Commission,* 128 Pa.Commonwealth Ct. 276, 563 A.2d 557 (1989), where this court stated that "a hearing or trial procedure is necessary only to resolve disputed questions of fact and is not required to decide questions of law, policy or discretion." *Id.* at 289, 563 A.2d at 564. Admittedly, we did not consider the right to a later full

Thus, because the plain language of the Code and PUC regulations require that the PUC hold an oral hearing and because applicable case law requires an oral hearing under the circumstances present here, I would vacate the PUC's approval of Met–Ed's application and remand for a proper hearing.

hearing to be a factor in *Lehigh Valley*. Nevertheless, there are at least two disputed questions of fact in this case. First, Diamond disputes that Met–Ed requires peaking capacity. Second, Diamond disputes that there is community opposition to the construction of transmission lines necessary to interconnect Diamond's generating unit with Met–Ed. (R.R. at 356a.) Thus, even under the standard espoused by this court in *Lehigh Valley*, an oral hearing is required here.